**2021 IL 126271**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126271)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ANTWOINE TEDDY EUBANKS, Appellant.

*Opinion filed November 18, 2021.*


JUSTICE MICHAEL J. BURKE delivered the judgment of the court, with
opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, and
Overstreet concurred in the judgment and opinion.

Justice Carter took no part in the decision.


**OPINION**

¶ 1    Defendant Antwoine Teddy Eubanks was charged with one count of first degree
murder in connection with the shooting death of Samuel Rush and one count of
aggravated battery for the shooting of Erik Childs. Pursuant to a plea agreement

entered into with the prosecutor, defendant gave a detailed statement confessing to the crimes. Defendant later filed several motions to vacate his guilty plea, which the trial court granted. The case thereafter proceeded to a stipulated bench trial, where defendant's statement was admitted into evidence. Defendant was convicted of first degree murder and sentenced to 50 years in prison. He filed a postconviction petition alleging that his trial counsel was ineffective for failing to suppress his videotaped statement under Illinois Supreme Court Rule 402(f) (eff. July 1, 2012). The Rock Island County circuit court denied the petition. The appellate court affirmed. 2020 IL App (3d) 180117. We allowed defendant's petition for leave to appeal (see Ill. S. Ct. R. 315 (eff. Oct. 1, 2019)) and now affirm the appellate court.

¶ 2                                    BACKGROUND

¶ 3        On the afternoon of March 30, 2010, Rock Island police officer Jon Cary responded to a report of shots fired on a residential street. At the scene, he found Rush and Childs in a bullet-ridden car. Rush, who would later die of his gunshot wounds, lay in the front of the car with his head on the driver's seat, and Childs, also shot, lay in the back seat. Childs told Cary that he did not see the shooter. But Cary canvassed the neighborhood and spoke to witnesses that had observed a dark Lincoln Town Car at the scene at the time of the shooting, along with a silver sedan creeping through a nearby alley.

¶ 4        In the meantime, an off-duty police officer had heard the gunshots and had observed a dark Lincoln Town Car fleeing the area. The Town Car and its occupants—Stephan Phelps and Pashanet Reed—were stopped by police, and both implicated defendant as the shooter.

¶ 5        Police located defendant in Decatur, Illinois, two weeks after the shooting. He agreed to be interviewed about the case and told police he left for Decatur after he learned he was a suspect in the shooting. Defendant denied any involvement but admitted to being with Phelps and Reed that day. Upon further questioning, he told police that Reed had "set it up."

¶ 6        Defendant was arrested on April 14, 2010, and charged with first degree murder and aggravated battery. In early 2011, the State and defendant reached a plea agreement. Pursuant to that agreement, the parties agreed to a 35-year sentence in

exchange for defendant's cooperation and a truthful statement from him about his involvement in the case. The State also agreed to dismiss the aggravated battery charge.

¶ 7 Thereafter, on April 19, 2011, defendant met with detectives and gave a videotaped statement detailing his involvement in the crimes charged. Defendant's attorney, Daniel Dalton, was present during the interview. Defendant told the detectives that he met up with Phelps and Reed on the morning of March 30, 2020. The trio drove around for several hours, drinking and smoking cannabis. Their discussions turned toward their shared animosity for Childs. Reed indicated that someone should murder Childs. Defendant said that he might do it, and Phelps suggested that defendant kill both Childs and Rush to eliminate the potential witness. The three men then made plans to kill Childs and Rush. They eventually settled on a scheme to lure Childs and Rush to 5th Street and 19th Avenue in Rock Island.

¶ 8 In execution of the plan, Phelps then called Rush and offered to sell him cannabis. Defendant parted from Phelps and Reed, both of whom drove together to the crime scene in a green Lincoln. Defendant, for his part, drove there in a rental car that he had borrowed from his brother. He parked in a nearby alley, awaiting the arrival of the victims. After Reed called defendant to let defendant know the victims had arrived, defendant came out of the alley clothed in black and carrying a gun that Phelps owned. Rush was standing by Reed's car, and Childs was in the back seat of Rush's car. Defendant approached Rush's car from behind, and before Childs could look up, defendant fired two or three shots at Childs. Rush then ran back toward his car, and defendant fired three shots at him.

¶ 9 According to defendant's statement, he planned to meet Phelps and Reed in Davenport after the shooting. But as he drove away, defendant observed in his rearview mirror that police were chasing Reed's car. Defendant spent the night in a Davenport hotel with his brother. The next day, he took a bus to Decatur to stay with his mother.

¶ 10 During defendant's interview, Assistant State's Attorney Norma Kauzlerich was outside the room watching the interview and texting questions to one of the detectives. Following the completion of the videotaped statement, attorney Dalton left the room to speak with the assistant state's attorney to "make sure we're good."

¶ 11    On May 11, 2011, defendant appeared in court to enter his guilty plea. The State told the court that the parties had reached a "negotiated disposition" that called for the State to recommend that defendant be sentenced to 35 years in prison for first degree murder and to dismiss the aggravated battery charge, provided that defendant "continues to truthfully cooperate and, if necessary, truthfully testify." Defendant confirmed on the record in open court that he understood the terms of the plea deal and that, if he went to trial, he faced 20 years to life in prison without parole if convicted, depending on "aggravating factors and things that could be proved." The trial court entered judgment on the first degree murder charge and dismissed the aggravated battery charge. The matter was continued for sentencing pending defendant's cooperation with respect to the cases involving his codefendants.

¶ 12    Defendant filed motions to withdraw his guilty plea on November 10, 2011, February 14, 2012, and March 27, 2012. The trial court permitted Dalton to withdraw from his representation of defendant and appointed attorney Nate Nieman to take over as defense counsel. Nieman filed a motion that alleged that Dalton misadvised defendant that he faced a minimum of 60 years in prison if found guilty when, in fact, the true minimum was 20 years. Defendant averred in his pleading that the plea agreement required him to "provide a true statement as to [his] involvement in the murder, and to testify, if necessary, against [the] other codefendants" in exchange for his receiving a 35-year sentence. Niemann later amended the motion to allege that the plea was void because the trial court did not have statutory authority to sentence defendant to less than 45 years in prison because of the required 25-year firearm enhancement to be added on to the minimum 20-year sentence for murder.

¶ 13    At the hearing on the motions to withdraw the guilty plea, the prosecutor warned that, if defendant withdrew his plea, the State could use his videorecorded statement against him at trial and, if convicted, defendant would face a minimum sentence at least 10 years longer than the agreed sentence. The trial court asked defendant if he understood the consequences of withdrawing his plea. Defendant indicated that he did. The court allowed defendant to withdraw the guilty plea, and it set the case for trial.

¶ 14        Prior to trial, defendant's new counsel filed a motion to suppress defendant's videorecorded statement. The plea agreement was void, the motion argued, because the trial court would not have been statutorily authorized to impose a 35-year sentence. The motion further urged that, because defendant had given his videorecorded statement in reliance on a promise that could not be kept, the prosecution should not be permitted to use the statement at trial.

¶ 15        The trial court denied the motion. In so doing it rejected defendant's contention that the 35-year sentence would have been unavailable. The court noted that, had defendant completed his cooperation, he would have been permitted to withdraw his original plea and enter a new plea to charges that did not include the firearm enhancement and that the court could have imposed the agreed 35-year sentence. And because the State was prepared to honor the plea deal, while defendant breached the deal by refusing to provide the bargained-for cooperation, defendant could not bar the State from using the videorecorded statement at trial.

¶ 16        Having failed to convince the court to suppress his videorecorded statement, defendant elected to proceed by way of a stipulated bench trial. The stipulations established that on March 30, 2010, Rush and Childs were found shot inside a vehicle. Reed and Phelps were found fleeing the scene in a dark green Lincoln. Phelps told police that he was with defendant on the day of the shootings and traded a gun with defendant that day. Phelps gave police the gun and ammunition defendant gave him. Reed told police that defendant shot Rush and Childs.

¶ 17        Officers found a cell phone at the scene of the shooting. Defendant drove to a store after the murder to obtain a new SIM card with the same cell phone number as the one found at the scene.

¶ 18        It was also stipulated that Reed and Phelps would have testified at defendant's trial that they drove around in a green Lincoln drinking alcohol and smoking cannabis with defendant on March 30, 2010. They went to defendant's brother's house, where defendant picked up a rental car. They then called Rush to set up a cannabis transaction. Upon meeting up, Rush exited his vehicle and walked toward the green Lincoln. Defendant then ran from the side of a house and started shooting into Rush's car. Rush ran toward his car, and defendant ran around the back of the car and shot Rush.

¶ 19    The State also presented defendant's videotaped interview. Assistant State's Attorney Kauzlerich stated that the detectives had interviewed defendant "pursuant to a proffer agreement."

¶ 20    The trial court found defendant guilty and sentenced him to serve a total of 50 years in prison—25 years for the murder conviction, plus 25 years for personally discharging a firearm (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010)).

¶ 21    Defendant appealed, arguing that his videotaped statement to police was inadmissible at trial. He claimed for the first time that his confession was barred by Illinois Supreme Court Rule 402(f) (eff. July 1, 2012), which provides that "if a plea of guilty *** is withdrawn, *** neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against defendant in any criminal proceeding." See *People v. Eubanks*, 2014 IL App (3d) 130021-U, ¶ 30. Defendant acknowledged that the issue had been forfeited but asked the appellate court to excuse the forfeiture as plain error because attorney Nieman had been ineffective in failing to argue the Rule 402(f) issue in the court below. The appellate court affirmed defendant's conviction and sentence, finding that the ineffective-assistance claim involved factual matters outside the scope of the record and that it therefore could not determine whether defendant's videotaped statement was made pursuant to plea negotiations. The appellate court recommended that defendant raise the issue in a postconviction petition.

¶ 22    Defendant then filed a postconviction petition. The circuit court appointed new counsel for defendant, who then filed an amended petition alleging that defendant's videorecorded statement was inadmissible under Rule 402(f) because it was given "during plea negotiations" and that his counsel was ineffective for failing to raise that argument and instead only arguing that the statement should be suppressed based on a contract theory. The petition proceeded to a third-stage evidentiary hearing.

¶ 23    At that hearing, Dalton testified that the State approached him about defendant providing evidence against Reed and Phelps. The State agreed to allow defendant to serve a 35-year prison sentence in exchange for a statement from defendant and defendant's further cooperation. Dalton arranged for defendant to give the statement to the detectives on April 19, 2011. Dalton further testified that defendant's videotaped statement "never would have been made but for that plea

agreement." Dalton stated that he never would have allowed defendant to give a statement without a plea deal in place.

¶ 24    Defendant agreed with Dalton's testimony regarding the events surrounding the plea deal. Defendant testified that Dalton told him "the State was willing to give him a deal." According to defendant, "in order for me to get the deal, I would have to give a statement, a truthful statement of my involvement in the case." The plea deal also required defendant to testify against his codefendants if need be. Dalton told defendant that the State was offering him a sentence of 35 years before defendant made his statement. Defendant further testified that he would not have made the videotaped statement if it had not been required by the plea deal.

¶ 25    The circuit court issued an order finding that defendant's April 19, 2011, statement was "not part of the plea discussion, but rather the result of the plea agreement, and thus Supreme Court Rule 402[(f)] was not violated." Accordingly, the court denied defendant's postconviction petition.

¶ 26    The appellate court, with one justice dissenting, affirmed the circuit court. 2020 IL App (3d) 180117. The majority found that the testimony from the third-stage evidentiary hearing established that a plea deal had been reached before defendant provided his videotaped statement. *Id.* ¶ 30. In finding the videotaped statement admissible, the majority relied upon Illinois and federal cases that have held that statements made by a defendant after a plea agreement has been reached, but before the defendant has pled guilty, are admissible. *Id.* ¶¶ 25-26 (citing *People v. Saunders*, 135 Ill. App. 3d 594, 606 (1985), *United States v. Watkins*, 85 F.3d 498, 500 (10th Cir. 1996), *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995), *United States v. Lloyd*, 43 F.3d 1183, 1186 (8th Cir. 1994), *United States v. Knight*, 867 F.2d 1285, 1288 (11th Cir. 1989), *United States v. Davis*, 617 F.2d 677, 682-86 (D.C. Cir. 1979), and *United States v. Stirling*, 571 F.2d 708, 731 (2d Cir. 1978)).

¶ 27    The dissenting appellate justice objected as a matter of policy to the majority's holding and the cases it relied upon. *Id.* ¶ 46 (McDade, J., dissenting). The dissent believed that the majority's holding would encourage the State "to time a defendant's confession [until] after he has agreed to a plea deal but before the trial court accepts the deal or enters judgment on it." *Id.*

¶ 29        The Post-Conviction Hearing Act (Act) allows a criminal defendant to assert in a petition that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2018). Postconviction proceedings are collateral to proceedings in direct appeal and thus "focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25. A defendant's allegation that trial counsel rendered ineffective assistance is such a claim.

¶ 30        To establish ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient and (2) prejudice resulted from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 681, 691-92 (1984). The performance must be evaluated from counsel's perspective at the time the contested action was taken and will be considered constitutionally deficient only if it is objectively unreasonable under prevailing professional norms. *Id.* at 687-89. To prove prejudice relative to the failure to seek the suppression of evidence, a defendant must " 'show that the unargued suppression motion was meritorious and that there is a reasonable probability that the verdict would have been different without the excludable evidence.' " *People v. Bailey*, 232 Ill. 2d 285, 289 (2009) (quoting *People v. Harris*, 182 Ill. 2d 114, 146 (1998), and citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), and *People v. Moore*, 171 Ill. 2d 74, 108 (1996)).

¶ 31        We proceed directly to the prejudice prong of the *Strickland* test because it is dispositive of the outcome in the present case. Before this court, defendant makes two arguments. First, he contends that his videotaped statement to detectives was part of the negotiation process and was therefore inadmissible under Illinois Supreme Court Rule 402(f) (eff. July 1, 2012) and Illinois Rule of Evidence 410 (eff. Oct. 15, 2015). Second, he maintains that, even if the videotaped statement was made after a plea deal had been reached, the statement should still be inadmissible for policy reasons. Therefore, defendant maintains, his trial counsel was ineffective in failing to suppress the statement on these grounds.

¶ 32        Rule 402(f) provides as follows:

"If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." Ill. S. Ct. R. 402(f) (eff. July 1, 2012).[1]

¶ 33 Clearly, statements that fall under the rubric of "plea discussions" cannot be admitted into evidence at the defendant's trial. *People v. Rivera*, 2013 IL 112467, ¶ 17. But not all statements made by a defendant in the hope of obtaining concessions are considered plea discussions under Rule 402(f). *Id.* ¶ 19 (citing *People v. Jones*, 219 Ill. 2d 1, 28 (2006), *People v. Rolih*, 233 Ill. App. 3d 484, 488 (1992), and *People v. Victory*, 94 Ill. App. 3d 719, 722 (1981)). There is a difference between a statement made as part of plea discussions and an otherwise independent admission, which is not excluded by Rule 402(f). *Id.* (citing *People v. Friedman*, 79 Ill. 2d 341, 353 (1980)). There is no bright line as to what constitutes a plea discussion, and the determination turns on the factual circumstances of each case. *Id.* (citing *Friedman*, 79 Ill. 2d at 352).

¶ 34 The purpose of Rule 402(f) is to " 'encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussion at his peril.' " *Id.* ¶ 18 (quoting *Friedman*, 79 Ill. 2d at 351). The rule is designed to protect communications made by the defendant in the bargaining process (see *People v. Morris*, 79 Ill. App. 3d 318, 332 (1979)) by preventing the jury from hearing any of the statements made during the attempt to reach an agreement to plead guilty (*People v. Connery*, 296 Ill. App. 3d 384, 388 (1998)).

¶ 35 This court has several times examined fact patterns involving statements by defendants falling on either side of the commencement of the negotiating process for plea bargaining. But we have not had occasion to consider a case involving a statement made after bargaining has been completed and a deal has been reached.

---

[1]Similarly, Illinois Rule of Evidence 410(4) (eff. Oct. 15, 2015) states that "any statement made in the course of a plea discussion[ ]" is inadmissible. Illinois courts have interpreted Rule 410 consistent with Rule 402(f). See *People v. Neese*, 2015 IL App (2d) 140368, ¶ 11 n.1. Consequently, any analysis with respect to Rule 402(f) would apply with equal force to Rule 410.

Our appellate court in *Saunders*, 135 Ill. App. 3d 594, however, had such an opportunity. We find its analysis instructive.

¶ 36　　There, defendant consented to give a statement as to his knowledge of the murder and to testify against any defendant who was arrested as a result of his statement. *Id.* at 597. In exchange for defendant's cooperation, the prosecutor agreed to charge defendant with the offense of concealing a homicide if defendant " 'could not be charged as a principal in the murder' " based on his statement. *Id.* The prosecutor also agreed to recommend that the defendant be sentenced to probation if he did not physically contribute to the death of the victim, while, if he did contribute to it, the recommendation would be that defendant serve two years in prison. *Id.* Defendant then gave the statement detailing his knowledge of the murder, but it was later discovered that he left out a key piece of information—*i.e.*, that he had inserted a syringe of air into the victim's arm and was therefore a principal in the crime. Subsequently, the codefendant against whom the defendant was to testify was acquitted. *Id.* at 598. Defendant was eventually tried before a jury on a murder charge, with his statement being introduced into evidence. He was convicted and sentenced to 40 years in prison. *Id.* at 596.

¶ 37　　On appeal, the defendant in *Saunders* argued that his statement and testimony against his codefendant were plea related under Rule 402(f) and should not have been admitted at his own trial. *Id.* at 604. The appellate court in *Saunders* rejected defendant's contention. *Id.* at 606. To support its holding, it relied upon federal law that has consistently held that statements, made after a plea agreement has been reached but before a defendant has pled guilty, are admissible. See *id.* at 604-06 (discussing *Stirling*, 571 F.2d at 730-32, and *Davis*, 617 F.2d at 683, 685, and citing *United States v. Grant*, 622 F.2d 308 (8th Cir. 1980)).

¶ 38　　In *Stirling*, defendant failed to plead guilty and therefore violated the terms of his plea agreement. The prosecution then used his grand jury testimony, which was a condition of his plea deal, as admissible evidence at his subsequent trial. Similar to our Rule 402(f), Federal Rule of Criminal Procedure 11(e)(6) barred the use in a criminal proceeding of any statements made " 'in connection with, and relevant to' " any offer or plea. *Saunders*, 135 Ill. App. 3d at 605 (quoting *Stirling*, 571 F.2d at 730 n.17). *Stirling* noted the policy behind the rule was to allow a defendant to negotiate freely without fear that his statement will later be used against him.

*Saunders* emphasized that, in holding that the statement was admissible, the *Stirling* court stated as follows:

> " 'It simply cannot be said that [the defendant] was engaged in a "discussion" *** in an attempt to obtain concessions from the government in exchange for his plea ***[.] The plea agreement had already been reached by the time [the defendant] went before the Grand Jury. The negotiations were over. All [the defendant] had to do was live up to his end of the bargain. His failure to do so justly exposed him to prosecutorial use of his Grand Jury testimony.' " *Id.* (quoting *Stirling*, 571 F.2d at 732-33).

¶ 39    *Saunders* observed that *Davis* reached the same result on similar facts. *Davis* recognized that excluding the admissibility of such statements that are made pursuant to an agreement between the prosecution and defendant

> " 'would not serve the purpose of encouraging compromise. Indeed, such a rule would permit a defendant to breach his bargain with impunity: he could renounce the agreement and return to the status quo ante whenever he chose, even though the Government has no parallel power to rescind the compromise unilaterally.' " *Id.* at 606 (quoting *Davis*, 617 F.2d at 685).

¶ 40    We find *Saunders*, and the considerable federal authority on point, to be persuasive. The construction rendered by these courts is not only consistent with the plain language of Rule 402(f) but also with its purpose, which "is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussions at his peril." See *Friedman*, 79 Ill. 2d at 351. The rule's purpose is accomplished by excluding statements made *during* the negotiation process. Once negotiations are complete and the parties have reached an agreement, however, there is nothing more for the rule to "encourage." At this point, the case is most likely to be resolved according to the parties' agreed disposition. See *Saunders*, 135 Ill. App. 3d at 606 (the purpose of Rule 402(f), which is to encourage negotiation, "would not be served" by excluding statements "made after and pursuant to the agreement").

¶ 41    As the instant appellate court observed, this interpretation is also consistent with general contract principles: " '[W]here a condition [of the contract] goes solely to the obligation of the parties to perform, existence of such a condition does not

prevent the formation of a valid contract.' " 2020 IL App (3d) 180117, ¶ 28 (quoting *McAnelly v. Graves*, 126 Ill. App. 3d 528, 532 (1984)).

¶ 42     Defendant argues before this court that, even if the statement in this case was given after a plea deal had been reached and in performance of that deal, it should still be inadmissible as a matter of policy. But defendant offers no valid basis for reading the term "plea discussions" in the rule to encompass something more than negotiations. More importantly, he fails to identify a single case that supports his position. Indeed, all the cases considering the issue uniformly hold that statements given after a plea agreement is finalized are admissible.

¶ 43     Defendant claims that acceptance of *Saunders* and the federal authority would have a chilling effect by reducing the number of plea deals. But he never adequately explains how this could be true. In our view, a defendant will either want to accept the plea deal at the time it is offered, or he will not. The condition of a truthful statement or testimony should have no impact on that. Both defendant and the appellate court dissent complain of "strategic gamesmanship" on the part of the prosecutor. See *id.* ¶ 46 (McDade, J., dissenting). But there is no indication of "gamesmanship" in this case.

¶ 44     Defendant further claims that this case shows "the folly" of the State's position that defendants generally have no reason to fear making a statement after negotiating a plea agreement. He argues, as a case in point, that a major term of the agreement—the 35-year agreed sentence—was rendered void by the factual basis given for the guilty plea by the prosecutor, which included the fact that a firearm was discharged.

¶ 45     We find no merit to defendant's contention. The record indicates that defendant could have still received the deal in this case but for his breach. As the trial court explained at the time it denied his motion to suppress, had defendant performed his cooperation obligations under the agreement, he would have been permitted to withdraw his plea and enter a new plea to charges that did not include the firearm enhancement. This court's decision in *People v. White*, 2011 IL 109616, left the door open for precisely this kind of agreement. See *id.* ¶¶ 37-41 (Theis, J., specially concurring). Justice Theis observed with approval that the majority opinion implicitly allows for prosecutors to negotiate around the mandatory firearm enhancement by amending the indictment and presenting a factual basis that refers

to a "dangerous weapon" rather than a "firearm," thus avoiding the 25-year mandatory add-on for a dangerous weapon. *Id.* Thus, we find that the deal was still available to defendant at the time he breached it by withdrawing his guilty plea.

¶ 46 Finally, we address the issue of whether defendant and the prosecution had finished negotiating the plea agreement *before* defendant gave his statement. The State argues that the question is one of fact subject to the manifest weight of the evidence standard. Defendant counters that it is one of law subject to this court's *de novo* standard of review.

¶ 47 We find that the standard of review hardly matters under the facts of this case because we can easily conclude based on this record that a plea deal was firmly in place *before* the videorecorded statement was made and that the statement was made pursuant to the deal. To be clear, a judge's factual findings and credibility determinations made at a third-stage evidentiary hearing of a postconviction proceeding should be disturbed only if "manifestly erroneous," that is, only if the court committed an error that is " ' "clearly evident, plain, and indisputable." ' " See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002), quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)). However, we also agree that the ultimate legal conclusion of whether the statement was admissible under Rule 402(f) should be reviewed *de novo*. See 2020 IL App (3d) 180117, ¶ 21.

¶ 48 Here, we agree with the lower courts that the testimony at the third-stage evidentiary hearing proved that a plea deal was entered *before* defendant made his videotaped statement. Attorney Dalton testified without contradiction that he would not have allowed defendant to make a statement without a plea deal in place. Defendant agreed with Dalton's testimony, stating that he would not have made the statement if it was not part of a plea deal. This was consistent with defendant's suppression motion, which alleged that his statement was made "pursuant to his obligation under the bargained reached with the State."

¶ 49 Defendant now argues that his videorecorded statement was merely a "proffer" because an assistant state's attorney was listening while detectives interviewed defendant during his statement and suggested questions. Moreover, defendant points to the fact that the assistant state's attorney referred to the plea deal as a "proffer agreement" on one occasion during the stipulated bench trial, although the

parties never used that term at any other point in the proceedings. We note, however, that all of these facts were before the court at the third-stage postconviction hearing, yet the court nevertheless found that, in light of Dalton's testimony, "[the plea] agreement was reached before the [videorecorded] statement was given." We find that this factual determination was more than amply supported by the record and was not manifestly erroneous.

¶ 50    Like the appellate court, we also reject defendant's contention that his statement was a condition precedent to the plea agreement. See *id.* ¶ 32. Again, the testimony below established that a plea deal was in place when defendant gave his videorecorded statement. Defendant's providing of that statement was not a condition precedent of the deal but, rather, was a fulfillment of a term of the deal. See *id.*

¶ 51    We hold that defendant's videotaped statement was admissible at his trial and was not barred pursuant to Rule 402(f). Accordingly, defendant suffered no prejudice because of his trial attorney's failure to argue in a motion to suppress that the statement was inadmissible based on the rule. His ineffective assistance of counsel claim was therefore correctly rejected.

¶ 52                                    CONCLUSION

¶ 53    For the reasons we have stated, we affirm the judgment of the appellate court, which affirmed the decision of the circuit court of Rock Island County to deny defendant's postconviction petition.

¶ 54    Judgments affirmed.

¶ 55    JUSTICE CARTER took no part in the consideration or decision of this case.