2022 IL App (1st) 210350-U

No. 1-21-0350

August 30, 2022

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos.    02 CR 10939 |
| | ) |          04 CR 4516 |
| | ) | |
| BISHARA THOMAS, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: The second-stage dismissal of defendant's postconviction petition is affirmed where the trial record does not support the claim that appellate counsel was ineffective for not challenging on direct appeal the sufficiency of the evidence that defendant personally discharged a firearm proximately causing death.

¶ 2    Defendant Bishara Thomas appeals from the dismissal, upon the State's motion, of his

postconviction petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-

1 *et seq.* (West 2020)). He contends that he stated a meritorious claim that appellate counsel was

ineffective for not challenging on direct appeal the sufficiency of the evidence that he personally discharged a firearm proximately causing death. We affirm.

¶ 3                                I. BACKGROUND

¶ 4     Following a 2005 jury trial, defendant was convicted of first degree murder by personally discharging a firearm, home invasion, and two counts of aggravated criminal sexual assault. He was sentenced to consecutive prison terms of 100 years for murder (including 40 years for personally discharging a firearm proximately causing death) and 20 years for each of the other offenses. We affirmed on direct appeal. *People v. Thomas*, No. 1-06-0508 (2008) (remanding for resentencing) (unpublished order under Supreme Court Rule 23); No. 1-10-1467 (2011) (affirming after resentencing) (unpublished summary order under Supreme Court Rule 23(c)). Because defendant's claim on appeal concerns the sufficiency of the evidence, we recount the facts in detail.

¶ 5                                A. Charges

¶ 6     In case 02 CR 10939, defendant and codefendants Paris Thomas (Paris), Stepmon or Steven Jackson, and Terrell Sims were charged with the first degree murder of Tonette Waters and home invasion of Waters's home on or about April 1, 2002. All defendants were charged with being armed with a firearm during the offenses. Defendant was charged with personally discharging a firearm proximately causing death. In case 04 CR 4516, defendant was charged with multiple counts of aggravated criminal sexual assault of Waters on or about April 1, 2002.

¶ 7                                B. Trial

¶ 8     In August 2005, defendant was tried simultaneously with Jackson by separate juries. We summarize only the evidence admitted at trial against and for defendant and heard by his jury.

¶ 9                                    1. Varielle Edwards

¶ 10    Varielle Edwards, Waters's daughter, testified to being six years old on April 1, 2002. She and Waters lived in a second-floor apartment with Edwards's father and younger brother. The apartment had its own door at the top of the stairs, which Waters kept locked. That door led to the living room. The back door of the apartment was in the kitchen and led to another set of stairs.

¶ 11    On the evening of April 1, 2002, Waters was dressed in "regular clothes" when she kissed Edwards and her brother goodnight. Edwards was asleep when she was awakened by a loud noise, followed by Waters coming to wake her and her brother. A "boy" with his face covered by black cloth had a grasp of Waters and held a gun to her head. Waters, who was still dressed, put Edwards and her brother in Edward's bedroom. As Edwards went there, she saw three other people in the apartment: one looking out the living room window, another in the kitchen "[t]hrowing the stuff around," and a third in Edwards's bedroom doing the same. Neither the kitchen nor Edwards's bedroom was disordered before she went to bed, and Waters kept her apartment "pretty neat."

¶ 12    At some point, Edwards came out of her bedroom. She saw the same "boy," still with a gun to Waters's head, bring the now-naked Waters to the bathroom. He shot Waters in the head by the bathtub and ran out the front door. Edwards described the gun as black and "flat laying down." She saw the other people leave the apartment by the back door. Edwards ran across the street, carrying her brother, to her grandmother's home to get help. She spoke with the police after they arrived, and again at the police station with her grandmother present.

¶ 13    On cross-examination, Edwards testified that Waters and the man with a gun to her head were fully dressed when she came to wake Edwards and her brother. Edwards stayed in her bedroom for about a minute before leaving to check on Waters. She did not hear the man tell

Waters to remove her clothes, nor see him remove Waters's clothing, unzip his pants, or rub against Waters. He fled the apartment just after shooting Waters, and the other men fled together. None of them wore gloves. Edwards denied telling police there had been only three men in the apartment or that she heard the man with the gun tell Waters to remove her clothes and go into the bathroom.

¶ 14                                    2. James Chatman

¶ 15    James Chatman testified that he was arrested on a charge of possession of a stolen motor vehicle and, just before this trial, pled guilty to theft and received two years' probation. He also had convictions for robbery and possession of a stolen motor vehicle. He lived with his grandmother. Defendant was his cousin who he saw frequently. Jackson was his long-time friend and drove a white Grand Marquis.

¶ 16    Chatman was home on the evening of April 1, 2002. Defendant arrived, spoke with him briefly, went to the basement for a few minutes, and left. Defendant had visited Chatman's basement many times before, and Chatman did not accompany him there. Chatman saw defendant leave in Jackson's car with Jackson driving and two other men in the back seat.

¶ 17    Less than a half-hour later, defendant returned by himself to Chatman's home. Sweating, he took a black gun from under his shirt and told Chatman to hide it because "we just did something with this." Chatman had never seen it before. He did not ask what defendant had done with it. He wrapped the gun in a white shirt and hid it in his basement. Defendant left after going to the washroom, where Chatman saw him wash his hands and face.

¶ 18    Chatman learned that night that Waters, who lived nearby, had been fatally shot. The next morning, he told Calvin Ridgell, a police officer and long-time friend, about the gun, including his

suspicion it was used in the Waters shooting.[1] Ridgell and another officer came to his home, and he gave them the gun. They took him to a police station where he was interviewed. His account was consistent with his trial testimony. At trial, he identified the gun that defendant gave him.

¶ 19   On cross-examination, Chatman testified that defendant did not live in his home or keep any clothes there. However, he did not object or comment when defendant went to the basement. He did not see what defendant did there, and he did not see a gun in defendant's possession as he left. Defendant did not mention borrowing a gun, planning a robbery, or going to Waters's home. When defendant returned with a gun, Chatman took it without objection despite convictions barring him from legally possessing a firearm. Chatman denied that the gun was his or that he merely returned it to its proper place when he hid it in his basement. However, he also testified he "[p]ut it back in the basement." Defendant was wearing the same clothing in his two visits that day and did not have any blood spattered on him when he returned with the gun.

¶ 20   On redirect examination, Chatman testified that he was arrested for possession of a stolen motor vehicle in May 2004 and had no pending criminal case in April 2002. He told police what he knew because he "felt bad" about Waters's death. The gun was warm when defendant gave it to him. Chatman told Officer Ridgell that he had a gun that may have been used to shoot Waters and that he believed defendant and Jackson did it. He said the same to detectives and identified the gun he turned in as the one defendant gave him the previous night. A few days later, he gave his account to an assistant state's attorney (ASA) and signed a statement based on his account. The next day, he gave the same account in grand jury testimony. He also gave the same account when

---

[1] Chatman spelled the officer's name "Riggel" but a fellow officer spelled it as Ridgell. *Infra* ¶ 24.

he testified in another trial in this case. On recross examination, he testified that the charge of possession of a stolen motor vehicle was pending against him when he testified in that earlier trial.

¶ 21                                      3. Police Investigation

¶ 22     Officer Anthony Hicks testified that he responded to the report of a shooting on the evening of April 1, 2002. On arriving at the scene, a second-floor apartment, he found the apartment front door apparently forced open. All the rooms were in disarray with the back door from the kitchen left open. Officer Hicks found Waters in the bathroom, naked and apparently dead, as she was not breathing and blood was flowing from her. He called for an ambulance and more officers. As he was still at the scene, Edwards returned home with her grandmother, who told him that Edwards had reported Waters's shooting. On cross-examination, he testified that he interviewed Edwards at the scene, and his report included that she said three men came into her home.

¶ 23     Detective Adrian Garcia testified that he and his partner were the first detectives at the scene. He noticed damage to the front door of the apartment, and every room of the apartment was "ransacked." Waters's body was in the bathroom in a puddle of blood, with a bullet wound to her head. Forensic technicians examined the apartment while Detective Garcia was there and found a shell casing in a bucket of water in the bathroom near Waters's body.

¶ 24     Officer Sam Dickerson, Officer Ridgell's partner, testified to accompanying him to Chatman's home where Chatman met them in the basement and gave them a gun wrapped in a white shirt. Officer Dickerson unloaded the gun, which was not fully loaded. The officers brought the gun and Chatman to the police station. On cross-examination, Officer Dickerson admitted to handling the gun with his bare hands and rewrapping it in the shirt to take it to the station.

¶ 25    Detective Kevin Bor testified to seeing Chatman and the gun at the police station. Noticing that the gun was the same caliber as the shell casing from Waters's bathroom, he arranged for expedited testing of the gun, the shell casing, and the spent bullet from Waters's body. Edwards and her grandmother came to the station, and Detective Bor interviewed Edwards. After Chatman was also interviewed, Detective Bor went to defendant's home. Defendant agreed to go to the station with him.

¶ 26    Detective Bor interviewed defendant for about two hours on April 2, confronting him with Chatman's information. On April 3, Detective Bor saw Jackson's white Grand Marquis being driven by his sister Tiffany Jackson (Tiffany) and asked her to come in for an interview. Detective Bor interviewed defendant on the evening of April 3 for about three hours, and on April 4 for about an hour. ASA Kim Ward then interviewed defendant, after which he gave a videotaped statement. Detective Bor was present as ASA Ward asked questions and defendant answered them.

¶ 27    On cross-examination, Detective Bor testified that Edwards said in her interview that three men invaded her home, including one with a gun. When asked if he learned that the gun Chatman turned in was his, Detective Bor replied that Chatman never indicated so. However, he admitted testifying in June 2004 that it was Chatman's gun. The gun was not tested for fingerprints.

¶ 28    On redirect examination, Detective Bor testified that, when he confronted defendant with Chatman's account during his April 2 interview, he changed his story from denying any involvement. Defendant claimed that Chatman went into his basement and gave him the gun. Defendant, Chatman, and two other men then rode in Jackson's car driven by Jackson until defendant left the car. A short time later, defendant saw Jackson, Paris, and Sims enter Waters's apartment building and did not see them again.

¶ 29    On April 3, defendant changed his story again. Jackson asked him to get a firearm from Chatman and said he was going to rob Waters's apartment. Defendant agreed to participate. He got the gun from Chatman, joined Jackson, Paris, and Sims in Jackson's car, and went to Waters's apartment where they put masks on or otherwise concealed their faces. Defendant gave the gun to Jackson, who gave it to Paris, who lied to get Waters to open the door and pointed the gun at her. Defendant and the others took turns searching the apartment and pointing the gun at Waters, then Jackson was alone with Waters in the bathroom. Defendant claimed he was on the back porch when he heard a gunshot, then Jackson came onto the porch and gave him the gun. Jackson, Paris, and Sims left by the back stairs. Defendant went back into the apartment and saw Waters's body in the bathroom with a gunshot to the head, then left and gave Chatman the gun.

¶ 30    During his April 4 interview, defendant changed his story yet again. He now claimed that he saw Jackson in the bathroom hold a gun to the head of naked Waters and shoot her in the head before handing the gun to defendant.

¶ 31                                4. Defendant's Statement

¶ 32    ASA Ward testified that, on April 4, 2002, she discussed the Waters homicide with detectives and then interviewed defendant, accompanied by Detective Bor. After the hour-long interview, defendant chose to memorialize his statement on video. He gave his statement on video to ASA Ward with Detective Bor present most of the time. ASA Ward identified a certain videotape as a true copy of defendant's statement, and it was played for the jury.

¶ 33    In his video statement, defendant agreed with ASA Ward's summary of their earlier interview: he had a gun when he and codefendants went to Waters's apartment and searched the apartment for drugs and money, and Jackson took Waters into the bathroom where defendant saw

that Waters was naked and saw Jackson shoot her in the head. On April 1, 2002, defendant was at his aunt's home, where his cousin Shawnice also lived. He was napping when Jackson called to ask if he had a gun. He told Jackson that he did not but could get one from Chatman. Jackson wanted a gun for a robbery but did not say who he intended to rob. Defendant told Jackson to call back later and went back to sleep. When Jackson called back, Chatman was home. Jackson told defendant that he wanted to rob Waters's apartment because her boyfriend sold drugs and kept money, cocaine, and heroin in the apartment. Defendant agreed to participate, and Jackson asked him to ask Chatman for his gun. Chatman initially refused but then spoke with Jackson on the telephone and said that Jackson was coming. Jackson arrived about 20 minutes later and said that the drug dealer was not home so "it's too easy." Chatman gave defendant his gun and asked Jackson for a portion of the robbery takings.

¶ 34    Defendant's statement continued that he put the gun in his pocket and left with Jackson in his white Grand Marquis. Paris and Sims were already in the car. When they got to Waters's building, they went upstairs and put on bandannas or hoodies to hide their faces. They planned to search the apartment for drugs and money. Outside the apartment door, defendant gave the gun to Jackson, who gave it to Paris. Jackson also gave Paris a set of keys, and Paris knocked on the door and lied to Waters that he had her boyfriend's keys. In his video statement, defendant identified Jackson's keys that he gave Paris for the subterfuge.

¶ 35    When Waters opened the door, Paris pushed it open and grabbed her, first in a chokehold and then by her hair. He pointed the gun at her and told her to shut up. He gave the gun to defendant, who pointed it at Waters and forced her into the dining room while Sims and Paris searched the front room. Jackson took the gun and forced Waters into a bedroom. Defendant started searching

the apartment. He saw Waters's two young children crying in a bedroom. After demanding Waters tell where the drugs and money were, Jackson led her out of the bedroom. Defendant grabbed her and the gun and brought her to the front window so he could see if anyone was coming.

¶ 36     The statement continued that the children ran out of the bedroom crying and defendant told Waters to calm them down. Waters and her children sat in the front room for about 10 minutes, then defendant had Waters take her children to a bedroom where he watched them. Jackson took the gun from defendant and led Waters to the pantry and then the bathroom, where he was alone with her "for a while." Defendant returned to searching. When he went to the bathroom, he saw Waters naked, which she had not been earlier. Jackson was behind her with the gun in his hand, repeatedly demanding she reveal the drugs and money. Defendant suggested they leave, but Jackson shot Waters in the head. Sims and Paris left by the back door, then defendant and Jackson left the same way. When he confronted Jackson over shooting Waters, Jackson gave him the gun and fled.

¶ 37     Defendant stated that he returned to his aunt's home where he returned the gun to Chatman. He told Chatman that things became "crazy" and "too wild" but gave no details. Later that night, Jackson called to say that Waters had been shot. Defendant asked why Jackson would say what they both knew, and he explained that Tiffany was at his end. When asked in his statement what the gun was for, defendant replied that they had the gun to scare Waters, not to harm her.

¶ 38                                     5. Tiffany

¶ 39     Tiffany testified to being Jackson's sister, Paris's cousin, and a neighbor of defendant and Sims. Paris and Sims were friends, and defendant and Paris were not related despite having the same last name. Tiffany identified defendant and Jackson in court. Jackson did not live with

Tiffany or elsewhere in Chicago but visited frequently. He drove a white Grand Marquis. Tiffany was a friend of Waters and acquainted with Chatman.

¶ 40    Jackson was in Chicago on April 1, 2002. Tiffany lent him her telephone, and he went out that evening with Paris. When he called her at about 8:30 or 8:45 p.m. and picked her up for an errand, he was driving his car with Paris and Sims as passengers. When she returned from her errand, Tiffany learned that Waters had been killed. Tiffany and Jackson went to Waters's home, using a relative's truck rather than Jackson's car. Before they went, Jackson returned Tiffany's telephone. While near Waters's home, Tiffany received a call from defendant, whose voice she recognized. She passed her telephone to Jackson, who took defendant's call out of her presence.

¶ 41    The next morning, Tiffany received two brief calls from defendant, which she later discussed with Jackson. Jackson left his car at Tiffany's home, and she borrowed it on April 3. Later that day, she learned that Jackson was wanted by police, who came to her home and took Jackson's car to the police station. An ASA interviewed her, and they viewed photographs from which she identified defendant, Jackson, Paris, and Sims as the people she saw or heard from on April 1, 2002. She also identified the keys to Jackson's car. In her grand jury testimony on April 5, she identified the same photographs.

¶ 42                          6. Autopsy and Forensic Evidence

¶ 43    Dr. Nancy Jones performed Waters's autopsy on April 2, 2002. Waters died of a single gunshot wound to the head. She had redness in, but no injury to, her anal area. Dr. Jones removed a bullet from inside Waters's body, took samples from her body including her fingernails, pubic hair, vagina, and rectum, and took a blood sample. Testing of "various fluids" from Waters's body was negative for alcohol, cocaine, or opiates.

¶ 44     On cross-examination, Dr. Jones testified that the lack of injuries consistent with sexual assault beyond the anal redness was not conclusive for a woman who had been sexually active and given birth. Waters had no injuries consistent with having been restrained. The gunshot wound showed no signs of close-range firing.

¶ 45     On redirect examination, Dr. Jones testified that the evidence, including Waters being found naked, was consistent with sexual assault. Putting a gun to someone's head would restrain them without causing visible injury. A gunshot two feet away would probably not show signs of close-range firing, and a gunshot from about a foot-and-a-half away may not show such signs, especially if the shot struck an area covered in thick hair. Waters had "abundant" braided hair.

¶ 46     Forensic scientist Kelly Biggs testified that she tested swabs from Waters's body against samples from all four defendants. The oral, rectal, and vaginal swabs contained semen. The rectal and vaginal swabs contained DNA from Waters and defendant. The likelihood that a random person other than defendant was the source of that DNA was "1 in 22 quadrillion blacks, 1 in 73 quadrillion whites, and 1 in 28 quadrillion Hispanic unrelated individuals." The oral swabs contained Waters's DNA and other DNA insufficient to make an identification except that Sims was not excluded as a possible source.

¶ 47     Forensic scientist Kurt Zielinski testified to conducting firearm testing of the shell casing from the scene and the bullet from Waters's body against the recovered gun with four live bullets. The bullet and casing had been fired from that gun to the exclusion of all other firearms.

¶ 48                           7. Defense Evidence

¶ 49    Defendant moved for a directed verdict, arguing that the evidence was insufficient to convict in general, and in particular to show his personal discharge of a firearm proximately causing death. The court denied the motion.

¶ 50    Shawnice Starling testified to being a cousin of both defendant and Chatman and to knowing Jackson and Waters from the neighborhood. When she came home from work at about 6:30 p.m. on April 1, 2002, Chatman and defendant were there. Defendant, a frequent guest, was asleep when Starling received a call from Jackson at about 7:30 p.m. and gave the telephone to defendant, who spoke with Jackson for some time. After the call, defendant went back to sleep, and he was still asleep when Jackson called him again. During the call, defendant gave the telephone to Chatman, who spoke very briefly before giving the telephone back to defendant. Starling then left the room. Some time later, Jackson arrived by car with passengers Starling did not recognize. Defendant got into Jackson's car, which then left.

¶ 51                           8. Verdict and Sentence

¶ 52    The jury found defendant guilty of first degree murder, including that he personally discharged a firearm proximately causing death, and of home invasion and two counts of aggravated criminal sexual assault.

¶ 53    Defendant's posttrial motion challenged the sufficiency of the evidence, and counsel argued in part that the evidence was insufficient to show that defendant personally discharged the firearm. The court denied the posttrial motion, finding the evidence generally sufficient.

¶ 54    The court sentenced defendant to consecutive prison terms of 120 years for the murder, including 60 years for personal discharge proximately causing death, and 30 years for each of the other three offenses.

¶ 55                              C. Direct Appeal and Remand

¶ 56    On direct appeal, defendant challenged an alleged lack of probable cause, the denial of his motion to suppress his postarrest statements, the failure to redact gang evidence from his videotaped statement, and an alleged discovery violation by the State. *Thomas*, No. 1-06-0508 at 2. He also challenged his 210-year aggregate sentence. *Id.* No contention was raised that the trial evidence was insufficient to convict him. *Id.* This court affirmed in part, finding in relevant part that his statements were voluntarily given and the evidence of his guilt was overwhelming, and reversed in part, remanding for resentencing. *Id.* at 26-27, 29, 31-37.

¶ 57    On remand, the court resentenced defendant to consecutive prison terms of 100 years for the murder, including 40 years for personal discharge proximately causing death, and 20 years for each of the other three offenses. On appeal, we affirmed. *Thomas*, No. 1-10-1467 at 1, 3.

¶ 58                              D. Postconviction Proceedings

¶ 59    In April 2012, defendant filed his *pro se* postconviction petition under the Act, claiming in relevant part that appellate counsel was ineffective for not claiming insufficiency of the evidence because the State failed to prove that defendant personally discharged the firearm that killed Waters. Defendant amended his petition *pro se* in 2013, 2014, and 2019 to raise additional claims.

¶ 60    Counsel was appointed in 2012. She later certified pursuant to Supreme Court Rule 651(c) (eff. July 1, 2017) that she consulted defendant and would not amend or supplement the petition.[2]

¶ 61    In September 2019, the State filed a motion to dismiss the petition. It argued, in relevant part, that defendant's claims were barred as *res judicata* or forfeited and that appellate counsel had argued reasonable doubt or insufficiency of the evidence.

¶ 62    The circuit court held a hearing on the motion to dismiss in March 2021. The State argued that an insufficiency claim cannot be raised in a postconviction petition. Counsel acknowledged that many of defendant's claims were raised on direct appeal and stood on the petition. The court granted the State's motion and dismissed defendant's petition, agreeing that many of his claims were disposed of on direct appeal and finding that he failed to make a substantial showing of a constitutional violation. This appeal timely followed.

¶ 63                                    II. ANALYSIS

¶ 64    On appeal, defendant contends that the circuit court erred in dismissing his postconviction petition because it stated a meritorious claim that appellate counsel was ineffective for not arguing the insufficiency of the evidence that defendant personally discharged a firearm proximately causing Waters's death.

¶ 65    The Act provides a three-stage process for postconviction petitions. *People v. House*, 2021 IL 125124, ¶ 16. Defendant's petition was dismissed at the second stage, where counsel may be appointed and the State may move to dismiss the petition. *Id.* ¶ 17. The circuit court must then determine whether the petition, including any accompanying documentation, makes a substantial

---

[2] The record does not include a Rule 651(c) certificate but the court and counsel noted that counsel had filed her certificate. Defendant does not claim that counsel did not file a Rule 651(c) certificate.

showing of a constitutional violation, dismissing the petition it if does not and advancing it to the third stage including an evidentiary hearing if it does. *Id*. In performing that analysis, the court accepts as true all well-pled facts not affirmatively refuted by the record and does not engage in factfinding or credibility determinations. *People v. Dupree*, 2018 IL 122307, ¶ 29. Review of a second-stage dismissal is *de novo*. *Id.*

¶ 66    The purpose of a postconviction proceeding under the Act is not to substitute for a direct appeal but to allow inquiry into constitutional issues with a conviction that were not, and could not have been, adjudicated on direct appeal. *People v. Eubanks*, 2021 IL 126271, ¶ 29; *House*, 2021 IL 125124, ¶ 15. Issues that were raised and decided on direct appeal are barred as *res judicata*, while issues that could have been raised on direct appeal but were not are forfeited. *People v. Reed*, 2020 IL 124940, ¶ 18.

¶ 67    Defendant could have, but did not, argue on direct appeal that the evidence was insufficient to prove he personally discharged a firearm proximately causing Waters's death. However, forfeiture does not apply as defendant alleges appellate counsel's ineffectiveness for failing to raise that argument on appeal. See *People v. English*, 2013 IL 112890, ¶ 22. Accordingly, we consider whether defendant made a substantial showing of ineffective assistance of appellate counsel.

¶ 68    To establish that appellate counsel was ineffective, a defendant must establish both the objective unreasonableness of counsel's performance and a reasonable probability that the appeal would have been successful but for counsel's error. *Eubanks*, 2021 IL 126271, ¶ 30; *English*, 2013 IL 112890, ¶ 33. Appellate counsel is not obligated to raise every conceivable contention of error but may exercise professional judgment in selecting from the many potential claims that might be raised on appeal. *English*, 2013 IL 112890, ¶ 33. We find defendant has not shown objective

unreasonableness in, nor prejudice from, counsel's failure to challenge the sufficiency of the evidence that defendant personally discharged a firearm proximately causing Waters's death.

¶ 69   When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. Taking the evidence in the light most favorable to the State includes making all reasonable inferences from the evidence in the State's favor. *Id.* It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the evidence, and we do not substitute our judgment for that of the trier of fact nor retry the defendant. *Id.* ¶ 39; *People v. Jackson*, 2020 IL 124112, ¶ 64. The positive and credible testimony of a single witness is sufficient to sustain a conviction even if the defendant contradicts it. *People v. Harris*, 2018 IL 121932, ¶ 27. A trier of fact may consider the evidence in light of his or her own knowledge and observations in the affairs of life. *People v. Newton*, 2018 IL 122958, ¶ 28.

¶ 70   A trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Cline*, 2022 IL 126383, ¶ 41. In other words, the State need not disprove or rule out all possible factual scenarios. *Newton*, 2018 IL 122958, ¶ 27. If the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt, it need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Cline*, 2022 IL 126383, ¶ 25.

¶ 71    The jury found defendant guilty of various offenses but he challenges only the State's failure to prove that he personally discharged a firearm proximately causing Waters's death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002).

¶ 72    Here, there was evidence, including defendant's own statement, of a single gun being used in the Waters home invasion. Edwards testified that three men were searching her apartment or keeping watch while a fourth man held a gun to Waters's head and eventually shot her in the head. While the defense tried to impeach Edwards on the point of how many men were in her apartment, defendant's own statement corroborated that four men were involved in the incident. Chatman and Tiffany's testimony confirmed that defendant was with three other men that night. While Edwards made no identification, she testified clearly that the same man had a gun to Waters's head both times she saw Waters during the incident. Defendant gave a statement that Chatman gave him the gun used in the Waters murder. Chatman testified that defendant tried to conceal a gun in Chatman's home. Forensic evidence showed that the gun Chatman received from defendant and turned in was the fatal weapon. A reasonable trier of fact could conclude that defendant obtained the gun from Chatman despite Chatman's denial that it was his gun, thus linking defendant to the gun both before and after the home invasion and shooting.

¶ 73    A reasonable trier of fact could accept the inculpatory aspects of defendant's statement without accepting at face value the self-serving or allegedly exculpatory aspects. Notably, his account made no mention of sexual assault and left little time for it except for when Jackson was allegedly alone in the bathroom with Waters. However, the forensic evidence of sexual activity, combined with the violent nature of the incident as admitted by defendant (Waters was constantly held at gunpoint and forced about the apartment) and the evidence that Waters was dressed well

into the incident but naked shortly before her shooting creates a reasonable inference that she was sexually assaulted as the jury found. A reasonable trier of fact similarly need not credit defendant's account that Jackson brought Waters to the bathroom and shot her.

¶ 74    Lastly, forensic evidence firmly linked defendant to the sexual assault of Waters. Semen was found in her vaginal and anal swabs, and defendant's DNA was found alongside her DNA in those swabs. Edwards testified to seeing one man with a gun to the head of the clothed Waters and later seeing the same man force the now-naked Waters into the bathroom and shoot her. Between these two sightings, Edwards saw three other men either searching the apartment or keeping watch out the window. In light of Edward's youth, the traumatic nature of the incident, and the evidence that defendant sexually assaulted Waters, a reasonable trier of fact could believe Edwards's testimony generally while not accepting at face value her testimony that only about a minute passed between Waters putting her in her bedroom and Waters being forced into the bathroom and shot. As such, a reasonable trier of fact could conclude that defendant was the man Edwards saw force Waters into the bathroom and shoot her.

¶ 75    Taking the evidence in the light most favorable to the State, as we would have been required to do on direct appeal, we cannot conclude that no rational trier of fact could find that defendant personally discharged a firearm causing Waters's death. Thus, had appellate counsel contended on direct appeal that the evidence of personal discharge by defendant was insufficient, we would have found the evidence sufficient and affirmed, as we did on the contentions actually raised against defendant's convictions. Therefore, there was neither a reasonable probability of a different outcome here nor an objectively unreasonable decision by appellate counsel.

Accordingly, defendant failed to show a meritorious claim of ineffective assistance and the court did not err in dismissing his petition.

¶ 76                                    III. CONCLUSION

¶ 77     For the reasons stated above, the judgment of the circuit court is affirmed.

¶ 78     Affirmed.