2023 IL App (4th) 220754

NO. 4-22-0754

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DAVID MICHAEL BOSWELL, | ) | No. 10CF1117 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Thomson, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Presiding Justice DeArmond and Justice Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1       Defendant David Michael Boswell was convicted of first degree murder. He was represented by the McLean County Public Defender's Office at trial. Following affirmance of the conviction and sentence on direct appeal, defendant sought relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2014)). He argued in his initial petition that he received ineffective assistance of counsel. This is the third appeal relating to defendant's postconviction petition. The initial appeal resulted in an agreed order for summary remand. On remand, appointed counsel amended the petition, adding the claim that defendant received ineffective assistance of counsel because the chief public defender aided in his prosecution. In the

appeal that followed, this court reversed the second-stage dismissal and remanded the matter for a third-stage evidentiary hearing. On remand, the circuit court conducted an evidentiary hearing and then denied the relief sought in defendant's amended postconviction petition, which defendant now appeals.

¶ 2       Defendant argues that he showed beyond a mere preponderance of the evidence that the McLean County chief public defender labored under a *per se* conflict of interest that disqualified the entire public defender's office from representing him and that his trial counsel labored under an actual conflict of interest. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4       Defendant was charged with and, following a jury trial, convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)). The McLean County public defender was assigned to represent defendant. At the time defendant was charged, Kim Campbell was the first assistant state's attorney for McLean County. At some point prior to defendant's trial, Campbell was appointed as the McLean County public defender. As will be discussed further below, Campbell said that she screened herself from any aspect of defendant's case, which was assigned to others in the office of the public defender.

¶ 5       At trial, assistant public defenders Carla Barnes and Brian McEldowney served as defendant's trial counsel. The attorneys for the prosecution were McLean County State's Attorney William Yoder and his first assistant, Martha Jane Foster (Jane Foster or Foster). Yoder gave the initial closing statement for the State, Barnes gave the closing statement for the defense, and Foster gave the surrebuttal for the State. Defendant's contentions in his postconviction petition center on the surrebuttal given by Foster and the suggestion that the chief public defender, Campbell, assisted the prosecution in preparing the surrebuttal.

¶ 6                                    A. Prior Proceedings

¶ 7          The factual circumstances and procedural history of defendant's case has previously been examined in detail. See *People v. Boswell*, 2013 IL App (4th) 120049-U; *People v. Boswell*, 2020 IL App (4th) 180165. Accordingly, we summarize the events leading to this appeal and only provide those facts relevant to the issues before the court.

¶ 8          Following his conviction, defendant filed a posttrial motion through counsel. The posttrial motion did not advance a claim of ineffective assistance of counsel based on a conflict of interest. The motion was denied, and defendant then pursued a direct appeal, which resulted in the affirmance of his conviction and sentence. See *Boswell*, 2013 IL App (4th) 120049-U, ¶ 7. Defendant then sought relief pursuant to the Act by filing a *pro se* postconviction petition. The circuit court summarily dismissed the petition and defendant appealed, resulting in an agreed motion for summary remand. *People v. Boswell*, No. 4-14-0508 (2015) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The motion stated that counsel had received an affidavit from Laura McBride, an investigator for the McLean County Public Defender's Office, alleging that Campbell, the chief public defender, commented that she had assisted Foster in writing the State's surrebuttal closing argument given at defendant's trial. This court remanded the matter for further proceedings and the appointment of counsel.

¶ 9          On remand, defendant's counsel filed an amended petition, alleging his right to effective assistance of counsel was abridged because Campbell labored under a *per se* conflict of interest where she assisted in crafting the State's closing argument. Specifically, defendant argued, "Campbell aided the prosecution of [defendant] by aiding *** Foster in creating Ms. Foster's rebuttal closing argument." Two affidavits from McBride were attached to the petition. In the first affidavit, she swore that, after complimenting Foster's closing argument, Campbell stated, "I

taught that girl everything she knows—I helped her write it." In the second, she swore that she and Campbell attended the closing arguments of defendant's trial and that "Campbell said to me that she helped Ms. Foster write the rebuttal closing argument for the State." The affidavit also stated that Campbell had supervisory authority over all the assistant public defenders in the county, including those who represented defendant, and that McBride informed Barnes of Campbell's statements the weekend after defendant's guilty verdict.

¶ 10     The State sought to dismiss the amended petition, and at the ensuing hearing, the circuit court granted the motion to dismiss. The court found there was no *per se* conflict of interest because defendant's trial counsel did not have any knowledge of, nor did they participate in, Campbell's alleged scheme to assist the prosecution. The court further found that there were no specific facts alleged warranting attribution of the alleged conflict to trial counsel. Further, the court found defendant failed to allege an actual conflict on the behalf of his trial counsel or that trial counsels' performance was impacted by the alleged scheme.

¶ 11     On appeal, this court reversed the circuit court's judgment and remanded for further proceedings, finding that taking the allegations in the postconviction petition as true—as a court must at the second stage—defendant made a substantial showing of a *per se* conflict of interest and was entitled to a third-stage evidentiary hearing. *Boswell*, 2020 IL App (4th) 180165, ¶ 28.

¶ 12                              B. Third-Stage Proceedings

¶ 13     On remand, the matter was assigned to a judge from a different judicial circuit at the request of the chief judge of the Eleventh Judicial Circuit. Barnes had become a circuit judge in the Eleventh Judicial Circuit, causing a conflict with all the judges therein. Once assigned to a judge in the Eighth Judicial Circuit, the circuit court conducted an evidentiary hearing, where numerous witnesses testified.

¶ 14          1. *Laura McBride's Affidavits and Testimony*

¶ 15          In September 2014, Laura McBride swore in the first of two affidavits that she sat and watched the closing arguments in defendant's case. When she walked out of the courtroom, she was with Campbell and stated, "I have to give Jane Foster credit, she did a great job on the closing argument." Campbell replied, "I taught that girl everything she knows—I helped her write it (the closing argument)." McBride reported the incident to Barnes the weekend after the guilty verdict. This affidavit was executed following her participation in an ethics investigation into Campbell by the chief judge of the circuit. McBride also cooperated with the Illinois State Police in their investigation into Campbell and Foster, which ultimately resulted in no charges. Campbell resigned as chief public defender in 2014. Barnes was then appointed as the chief public defender.

¶ 16          In August 2017, McBride executed the second affidavit, where she swore: "After Assistant State's Attorney Jane Foster gave the rebuttal closing argument for the State, Kim Campbell said to me that she helped Ms. Foster write the rebuttal closing argument for the State." Shortly after McBride executed the second affidavit, her position was eliminated from the public defender's office. McBride filed a civil suit against McLean County and Barnes, who was then the chief public defender.

¶ 17          McBride testified that she was an investigator in the McLean County Public Defender's Office up until her termination and was currently employed in a similar position in the Federal Defender's Office. McBride met Campbell when she started working at the McLean County Public Defender's Office in 1997, where Campbell was an assistant public defender. McBride took part in the defense investigation of defendant's case, testified at trial, and sat next to Campbell while attending closing arguments. After closing arguments, McBride commented on Foster's rebuttal closing argument. Campbell replied, "I taught [Foster] everything she knows. I

helped her write it." Having known Campbell since 1997, McBride was familiar with her personality at the time of the alleged comments at issue and felt she knew when Campbell was joking or being sarcastic; she did not think Campbell was joking or being sarcastic and was "taken aback" by Campbell's remark.

¶ 18    McBride reported the comment to Barnes the weekend after the jury returned the verdict but before posttrial proceedings. According to McBride, Barnes was also "taken aback" and disappointed but felt it was best to leave the comment alone, since Campbell was their supervisor. Barnes told McBride that closing arguments were not evidence and that she did not feel the defense was compromised.

¶ 19                    2. *Carla Barnes's Affidavit and Deposition*

¶ 20    Pursuant to a joint stipulation, defendant submitted into evidence the deposition of Barnes given in the federal civil suit filed by McBride following her termination from the public defender's office. The State also offered Barnes's affidavit into evidence without objection.

¶ 21    In her affidavit, Barnes acknowledged that, after closing arguments, McBride informed her that Campbell stated, " 'I taught [Foster] everything she knows. I wrote that argument for her,' or words to that effect." Barnes did not observe, nor did she have reason to believe, that Campbell assisted with any aspect of defendant's prosecution. She did not believe that Campbell assisted Foster in preparing the surrebuttal closing argument. None of the decisions made or actions that she took "or elected not to take in the defendant's case were in any way driven by, altered, impaired, or otherwise affected by Campbell's role as Public Defender or her relationship with [ ] Foster."

¶ 22    In her deposition, Barnes acknowledged that she was lead defense counsel at defendant's trial and McBride testified on behalf of the defense. At some point, McBride informed

Barnes of Campbell's remark about assisting Foster with the surrebuttal argument. Barnes discussed the matter with co-counsel, McEldowney, and "didn't think that it was anything that we would need to report." She explained that she did not hear the comment directly, nor did she believe what McBride had reported about Campbell to be true. She reasoned that Campbell was possibly bragging because she was friends with Foster. She did not bring the comment to the attention of the trial court in a posttrial motion. Barnes eventually discussed the remarks with another judge as part of an investigation into Campbell and Foster's conduct and confirmed that McBride reported Campbell's remark to her shortly after trial.

¶ 23                                  3. *Brian McEldowney*

¶ 24          Brian McEldowney testified that he had been a McLean County assistant public defender for over 25 years and represented defendant at trial with Barnes, serving as lead defense counsel. McBride assisted the defense with the case. McEldowney had utilized McBride's services in other cases and commented that she was a very good, competent, insightful, and valuable employee. He would rely on McBride's summarization of interviews and collection of evidence.

¶ 25          McEldowney kept notes and a copy of discovery from defendant's case in a filing cabinet in the public defender's office. He did not make a practice of locking his file cabinet or individual office door, which he felt was standard practice throughout the office. All employees possessed pass cards required to gain entry to the office complex after hours and Campbell, among others, frequently visited the office outside of regular business hours. An officer on call could also "buzz" individuals into the office. While Campbell may have theoretically had the opportunity to examine McEldowney's discovery file in defendant's case, he had no reason to suspect this ever occurred.

¶ 26 McEldowney knew that Campbell was not involved in defendant's defense and did not participate in meetings between himself and Barnes on defendant's case, including any trial strategy meetings. Neither McEldowney nor Barnes reported to Campbell regarding decisions they made at defendant's trial, and Campbell "didn't have any input" on the case. McEldowney was unaware of the allegations that Campbell assisted the prosecution until sometime in 2014. He could not recall discussing the matter with Barnes shortly after the trial. If he would had been made aware of the allegations following trial, it would have been an "uncomfortable position." Although he initially claimed he would not have known what to do, he would have been "interested to know *** if [Campbell] was colluding with the State *** because it didn't appear to me as if she had any information that wasn't public information. I don't know what I would have done in response to that."

¶ 27 He agreed that it would be "improper" for a defense attorney to "write a prosecution's rebuttal closing argument." He felt that an allegation of this nature should be brought to the trial court's attention. In this situation, he knew that Campbell did not have "much if any involvement" in the case but would have been troubled and might have questioned Campbell about the comment and, ultimately, "might have reported it to the [c]ourt." Campbell's position as supervisor would not have impeded his decision to act.

¶ 28                                   4. *Kim Campbell*

¶ 29 Campbell joined the McLean County State's Attorney's Office in 2002 and became first assistant in 2005. Foster was already working at the state's attorney's office, prosecuting misdemeanors, and Campbell became Foster's mentor upon joining the office. The mentorship eventually ripened into a friendship.

¶ 30        In 2010, Campbell was appointed as the McLean County public defender. In her role as chief public defender, Campbell had authority over work assignments, evaluations, and pay raises for all attorneys and staff in the office. Generally, Campbell would have weekly meetings with attorneys assigned to homicide cases but did not do so in defendant's case. Campbell explained that she was still the first assistant state's attorney when defendant was indicted in December 2010, so she assigned first assistant public defender Ron Lewis to supervise defendant's trial. She had no supervisory role in defendant's case, did not know where defendant's trial counsel specifically kept his case file, and denied accessing it herself.

¶ 31        Campbell stated it was "common practice to watch closing arguments in murder cases" regardless of whether she was defending or prosecuting. She could not recall being present for the initial closing argument by Yoder or the closing argument presented by Barnes, but she did remember witnessing the argument given by Foster because it was underway when she entered the courtroom.

¶ 32        The courtroom was crowded, and her seating options were limited, so Campbell had to "slide in" where she could; she took a seat next to McBride. Once the jury exited the courtroom to begin deliberations, McBride commented, "[O]h my goodness, [Foster] just gave a killer rebuttal. This isn't going well, or something to that effect." Campbell did not "exactly recall" her response, but remembered she "kind of jokingly said, that's what I get for being such a good mentor, or that's what I get for training [Foster], something to that effect." She denied telling McBride that she assisted in writing Foster's surrebuttal closing argument and that, "If I made any comment it was a joke *** I was being sarcastic because, yes, [Foster] did give a good rebuttal, and, you know, I shouldn't have trained her so well. I don't recall exactly what the words or the

- 9 -

phrasing was that I used." Any comment made to McBride was meant to be a sarcastic joke of the kind she had previously directed toward McBride in conformity with her personality.

¶ 33     Campbell had mixed feelings after witnessing Foster's argument; she was proud to see her mentee do so well but disappointed because of the negative effect it had on her client's defense. She unequivocally denied that she assisted Foster in writing the surrebuttal closing argument or assisted the prosecution in anyway during defendant's trial. Campbell did not become aware of McBride's allegations that she wrote Foster's surrebuttal closing argument until two years after the trial.

¶ 34     The State raised an objection to the relevance of testimony regarding the nature of Campbell and Foster's relationship in 2013 and beyond as too remote, stating the crux of the issue before the court was their relationship in 2011, during defendant's trial. The court agreed that the focus was on the allegedly improper relationship as it existed during the jury trial in 2011 and the testimony regarding the relationship in 2013 was "rather remote." The court allowed defendant to provide an offer of proof for testimony as it related to anything beyond the relevant time period.

¶ 35     The remainder of Campbell's testimony was an offer of proof regarding a 2013 vacation Foster and Campbell took together and various Facebook posts made during the trip. She also stated that she offered a contract to Foster to defend cases on behalf of the public defender's office, after Foster lost in the primary election for state's attorney. The county board ultimately approved that contract. Campbell resigned as the public defender in 2014.

¶ 36     At the time of her testimony, Campbell worked as a risk and compliance manager at U.S. Bank.

¶ 37                              5. *Jane Foster*

¶ 38        Jane Foster testified that she was a McLean County assistant state's attorney from 2001 through 2013 and she then signed a contract to become a special public defender for the public defender's office. At the time of her testimony, she also worked in the corporate compliance department at U.S. Bank, albeit in a division separate from Campbell's.

¶ 39        Foster met Campbell after Campbell was hired at the state's attorney's office in 2002. Campbell was a senior felony attorney in the office, while Foster prosecuted misdemeanors. Foster was "looking for a mentor in the office, and after observing [Campbell] in court and her trial work, *** sought her out as a mentor." A few years later they became friends.

¶ 40        Foster was the representative for the State in the county drug court, and Campbell was the representative for the public defender's office. In 2009 or 2010, Foster and the rest of the drug court team attended a conference paid for by a federal grant. She could not recall requesting to share a room with Campbell at the conference but rather was "told [they] had to share rooms." She also did not recall making a request to sit next to Campbell on the plane to the conference but would not be surprised if she did "because [she] did not enjoy sitting by strangers on a plane."

¶ 41        Eventually, Campbell became the first assistant state's attorney and then became the chief public defender shortly after defendant was charged in the underlying case. Once Campbell became the chief public defender, Foster became the first assistant state's attorney. Foster had considerable trial experience by the time she prosecuted defendant's case and was the first assistant state's attorney at the time. Yoder delivered the State's closing argument, and Foster delivered the State's surrebuttal closing argument.

¶ 42        In a case like defendant's, Foster would have prepared the State's case extensively prior to trial. When asked if she had prepared her surrebuttal closing argument prior to delivering it, Foster said:

"You can't really prepare a rebuttal, you have to wait and see what the defense says [in closing]. And that's how my practice has always been in trials. I wait to see what the defense highlights and then I choose what I think is the strongest point to rebut, and use their words against them to end the case strongly."

¶ 43 Foster waited until after Barnes gave her closing argument for the defense to formulate the surrebuttal closing argument. She admitted that, from a strategic standpoint, it was apparent from the police reports "that the only option the defense had was [to] try and make the codefendant as the driver of the truck instead of defendant." In her surrebuttal, she decided

"to focus on the independent evidence that proved [defendant] was the driver, which specifically was the baseball hat that he was wearing at the time of the incident, which was observed by our independent witness, which was testified to, which was also testified to by his codefendant, which was also seen in video from Walmart the day of the incident, where he had the baseball hat on. And when he was arrested, weeks, possibly months later in Tennessee he was wearing that exact same hat. So I do recall picking up that hat and using that as the thrust of my rebuttal."

¶ 44 She denied that Campbell assisted her in crafting the surrebuttal, as it was not until the morning of closing arguments that Yoder even informed her she would be presenting the surrebuttal. She did not speak with Campbell between learning she was delivering the argument and actually doing so. Even if she wanted to discuss the matter with Campbell, there would not have been enough time to do so.

¶ 45 Foster did not become aware of the allegation that Campbell assisted in preparing the surrebuttal until "many years after the trial." When Foster asked Campbell about it, Campbell

said that she made a "joke" to McBride about teaching Foster "everything she knows." Foster did not believe that Campbell ever said that she helped Foster write her surrebuttal closing argument and called the allegation "preposterous."

¶ 46 At the end of 2011, Foster announced that she was running for McLean County state's attorney in the March 2012 primary. In November or December 2011, Campbell circulated a petition on Foster's behalf to place her on the ballot in the state's attorney's race. Foster ultimately lost the primary election.

¶ 47 An offer of proof was then made regarding the 2013 vacation, where Foster acknowledged she paid for the vacation. Foster also reviewed Facebook posts she and Campbell made while on vacation. In 2013, she signed a contract to become a special public defender for the public defender's office under Campbell. That contract was terminated in August 2014, shortly after Campbell resigned as chief public defender.

¶ 48                                    6. *Carrie Handy*

¶ 49 Carrie Handy was a paralegal in the McLean County Public Defender's Office since January 2013. The entirety of her testimony was given as an offer of proof. Generally, Handy's testimony concerned her prior employment as a paralegal at a private law firm that Foster also worked at. She was aware that Campbell and Foster had a relationship as far back as 2012. Foster made a phone call to Campbell on Handy's behalf after she had applied for a paralegal position at the public defender's office. Once she began working in the public defender's office, she would observe Foster come to "visit" Campbell and another attorney in the office. She also stated that Foster and Campbell went on a "trip" together and that Foster paid the expense.

¶ 50                                    7. *Mary Meier*

¶ 51        Mary Meier had been the office manager for the McLean County Public Defender's Office for over 20 years. She was familiar with Campbell and Foster's relationship and categorized them as friends, possibly even best friends. Campbell and Foster developed a relationship while working together in the state's attorney's office. Campbell was the first assistant state's attorney and was senior to Foster. When Campbell became head of the public defender's office, the two stayed in contact and went to professional conferences together. In one instance, the two wanted to "travel together and stay in the same room" when attending a national drug court conference for prosecuting and defense attorneys. The two attended the conference as the "team" for the McLean County drug court. While individuals had previously requested to go to conferences together, she was unaware of a situation where they requested to room together.

¶ 52        Meier could not recall the exact time of year—she thought it might have been fall 2011—Campbell asked her to sign a petition on behalf of Foster as a candidate for McLean County state's attorney. She signed the petition while she was in her office and notarized it with the stamp she was required to have as a notary in the public defender's office.

¶ 53        The remainder of Meier's testimony was an offer of proof regarding the 2013 vacation Foster and Campbell took together and Facebook posts.

¶ 54                            8. *Nellie Hilt*

¶ 55        Nellie Hilt was a legal assistant at the public defender's office and had worked there for nine years beginning in 2013. The entirety of her testimony was an offer of proof concerning the 2013 vacation and Facebook posts. She also testified regarding her attendance at a quilting party held at Foster's home that Campbell also attended, and that Campbell and Foster were good friends.

¶ 56                            9. *Sasha Jennings*

¶ 57 Sasha Jennings was a paralegal assistant in the public defender's office from 2006 through 2015. During 2011, she characterized Campbell and Foster's relationship as "really good friends." In 2011, Campbell asked Jennings to sign a petition on behalf of Foster as a candidate for the McLean County state's attorney in the office during work hours and place a corresponding political sign in her yard. She felt pressured to sign the petition and, in fact, signed it.

¶ 58 The remainder of her testimony was an offer of proof regarding the vacation Foster and Campbell took together in 2013 and Facebook posts.

¶ 59                                            C. Circuit Court's Order

¶ 60 The circuit court took the matter under advisement and issued a written disposition. The court held that defendant failed to prove by a preponderance of the evidence that a violation of his constitutional rights had occurred. After making credibility determinations and considering the totality of the evidence, the court found that "Campbell did not in fact assist Foster in the preparation of Foster's surrebuttal closing argument." Further, defendant's interpretation of "Campbell's alleged statement as an 'admission' is unreasonable and not supported by the evidence." Moreover, defendant did not receive ineffective assistance of counsel when Barnes failed to bring the allegations of McBride to the attention of the trial court via posttrial pleadings. The court reasoned that "Barnes never observed or had any reason to believe that Campbell assisted with any aspect of the prosecution of [defendant] and that Barnes never actually believed that Campbell assisted Foster in preparing the rebuttal closing argument or in any other way." Given Barnes's belief that McBride's statement was not true, any allegation that Campbell assisted the prosecution would violate Illinois Supreme Court Rule 137(a) (eff. Jan. 1, 2018) (requiring an attorney to certify that allegations in a pleading or other document submitted to the court are "to

the best of his knowledge, information, and belief formed after reasonable inquiry *** well grounded in fact").

¶ 61      This appeal followed.

¶ 62                    II. ANALYSIS

¶ 63      Defendant contends his counsel labored under both a *per se* conflict of interest and an actual conflict of interest. In the *per se* conflict argument, defendant contends that a conflict was proven on two separate bases: (1) that credible evidence presented at the hearing proved Campbell assisted Foster in his prosecution and (2) the contemporaneous relationship of Campbell and Foster, including the circumstances surrounding Campbell's assistance with Foster's campaign for state's attorney. Although defendant commingles these arguments throughout his briefing, we isolate the arguments on this point for analytical clarity. Defendant also argues that Barnes labored under an actual conflict of interest where she was aware of Campbell's comment to McBride but failed to bring it to the trial court's attention in posttrial pleadings. Finally, several offers of proof were also made in the circuit court, which we address where appropriate.

¶ 64      "The [Act] allows a criminal defendant to assert in a petition that 'in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.' " *People v. Eubanks*, 2021 IL 126271, ¶ 29 (quoting 725 ILCS 5/122-1(a)(1) (West 2018)).

¶ 65      The Act contemplates a three-stage process, and if a defendant makes the requisite substantial showing at the second stage of a violation of constitutional rights, as was the case here, the defendant is entitled to a third-stage evidentiary hearing. *People v. Domagala*, 2013 IL 113688, ¶ 34. During the third-stage hearing, the circuit court serves as the finder of fact and must "determine witness credibility, decide the weight to be given testimony and evidence, and resolve

any evidentiary conflicts." *Id.* Ultimately, the court will determine whether defendant is entitled to relief. *Id.* "To be clear, a judge's factual findings and credibility determinations made at a third-stage evidentiary hearing of a postconviction proceeding should be disturbed only if manifestly erroneous, that is, only if the court committed an error that is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Eubanks*, 2021 IL 126271, ¶ 47. At the third stage, defendant has the burden to make a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 66        The deprivation of effective trial counsel due to a conflict of interest is a claim amenable to relief pursuant to the Act, as "[a] criminal defendant's sixth amendment right to effective assistance of counsel includes the right of conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36. "Conflict-free representation means 'assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations.' " *People v. Green*, 2020 IL 125005, ¶ 20 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988)). In Illinois, conflicts of interest are divided into two categories, *per se* and actual. *Id.*; see also *Spreitzer*, 123 Ill. 2d at 14 (noting "[t]he term '*per se*' conflict does not appear in the United States Supreme Court case law, or for that matter, in cases from our sister jurisdictions").

¶ 67                           A. *Per se* Conflict of Interest

¶ 68        A conflict of the *per se* variety will arise when specific facts about the defense attorney's status, by themselves, create a disabling conflict. *Yost*, 2021 IL 126187, ¶ 39. Our supreme court has delineated three situations in which such a conflict will arise, one of which is the focus of this appeal: "[W]hen defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution." *Id.* ¶ 66. To establish a *per se*

conflict, the defendant is not required to demonstrate prejudice, and the finding of such a conflict generally requires automatic reversal absent a waiver of conflict-free representation. *Id.* ¶ 39.

¶ 69 Initially, we discard a contention made by defendant throughout his briefing that somehow this court in the previous appeal made a ruling on the merits of the amended postconviction petition. See *Boswell*, 2020 IL App (4th) 180165, ¶¶ 24-25. Defendant's argument is misguided, as the prior review was of a second-stage dismissal where the court was required to take all well pled allegations in the petition as true. This is made clear in the legal framework set forth in the opinion that "[a]t this stage, 'all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true.' [Citation.] The court is not to engage in fact-finding or credibility determinations at the second stage, as these determinations are to be made at the evidentiary stage." *Id.* ¶ 15. Taking the allegations in the petition as true, the court found that defendant had made a substantial showing of a constitutional deprivation. The appellate court's opinion is replete with qualifying language, and, as a matter of law, the court was precluded from ruling on the merits. That was the circuit court's function at the third stage.

¶ 70 We turn now to the question that took center stage at the hearing: whether Campbell aided Foster in crafting the surrebuttal closing argument for the State. In sum, defendant argues, "McBride was a far more believable witness who was not impeached and there was no sound reason for the circuit court to find Campbell and Foster more credible than McBride." Effectively, on this point, the evidentiary hearing below was a swearing contest. McBride testified and swore in two affidavits that Campbell stated she helped Foster write the surrebuttal closing argument. Campbell could not recall making that statement, but if she did it was meant as sarcasm, and she did not assist Foster in defendant's prosecution. Foster denied the allegations that Campbell assisted with any part of the prosecution and stated the allegations she did so were "preposterous."

Foster also stated that she did not script her surrebuttal, as one is limited to only the points that are brought up in the defense's closing argument, and she was not assigned the surrebuttal closing argument until the morning of the arguments. Even if she wanted to reach out to Campbell, there was insufficient time to do so. Barnes did not believe the allegations that Campbell assisted the prosecution to be true. Her interpretation of the comment was not literal; instead, she believed that Campbell was bragging because she and Foster were friends. McEldowney stated he was not aware of the allegations until years later, which conflicts with the representations made by Barnes that she discussed the matter with him. Nonetheless, he knew that Campbell was not involved in defendant's defense and possibly would have questioned her if he had known of the allegations.

¶ 71 Courts of review apply the manifestly erroneous standard to third-stage evidentiary hearings in recognition of " 'the understanding that the postconviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 48 (quoting *People v. Coleman*, 183 Ill. 2d 366, 384 (1998)). On this record, we are unable to find that the circuit court committed an error that is clearly evident, plain, and indisputable in finding that Campbell did not assist Foster in writing the surrebuttal closing argument.

¶ 72 Defendant cites *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981), while referring to McBride's testimony, arguing that a "trier of fact cannot arbitrarily or capriciously reject the testimony of an unimpeached witness." This is an oversimplification of the proposition of law cited, as *Baker* states: "Where the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been

- 19 -

impeached, that testimony cannot be disregarded even by a jury." *Id.* Simply put, the circuit court did not receive uncontradicted testimony.

¶ 73            Further, the circuit court found it "inherently improbable" or "unreasonable" to interpret Campbell's statement about Foster's surrebuttal as an " 'admission.' " The court likely came to this conclusion, given that the alleged statement is susceptible to varying interpretations. For instance, taking McBride's allegation as true, Campbell could have very well meant that, by teaching Foster "everything she knows," those teachings formed the foundation of the surrebuttal closing argument and it was as if she "helped her write it." This appears to be the interpretation adopted by Barnes. Regardless, the court's finding that Campbell's statement was not an admission is not unreasonable, nor was it made in ignorance of the evidence presented. See *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55.

¶ 74            Turning to defendant's argument concerning Campbell and Foster's contemporaneous relationship and Campbell's assistance with Foster's election campaign, we note that there is a considerable amount of variance in both the argument presented in defendant's amended postconviction petition and advanced at the third-stage hearing when compared to those presented on appeal. Below, defendant argued that a *per se* conflict existed where Campbell assisted the prosecution during his trial, specifically, assisting in crafting closing arguments. On appeal, the opening salvo in his brief, and a theme intertwined throughout all of his arguments, revolves around whether *standing alone* a *per se* conflict existed where Campbell and Foster had a contemporaneous relationship and the circumstances surrounding a petition Campbell circulated to have Foster placed on the ballot for the state's attorney primary election. This basis is not mentioned in the opinion resolving the previous appeal, and no amendments were made to the petition following remand. A further review of defendant's closing arguments presented to the

court during the third stage reveals an absence of a request to even consider this ground that was not pled as a standalone basis; instead, defendant focused only on the allegation that Campbell assisted the State in his prosecution and used evidence of the relationship as support for that argument.

¶ 75 Defendant argues that the undisputed evidence regarding the relationship of Foster and Campbell and the circumstances surrounding Foster's campaign for state's attorney "*alone* [were] sufficient to demonstrate a *per se* conflict *** and [were] wholly ignored by the circuit court in its ruling." (Emphasis added.) However, we cannot fault the circuit court for failing to rule on an argument that was never advanced; it is well established that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2014). The State ignores this procedural default and engages the argument on the merits, but this court does not enjoy the same latitude, as "a claim not raised in a petition cannot be argued for the first time on appeal." *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Accordingly, defendant's argument that the circuit court ignored this claim is without merit, as defendant did not seek a ruling on this basis.

¶ 76 Even absent procedural default, we note that defendant's argument relies on our now outdated statement in the previous appeal that a prior or contemporaneous relationship may give rise to a *per se* conflict. See *Boswell*, 2020 IL App (4th) 180165, ¶ 18. This is no longer the law following *Yost*, where the supreme court made clear that the focus should be on contemporaneous, not prior, associations. *Yost*, 2021 IL 126187, ¶ 66. Despite the court's clarification in *Yost*, defendant stretches the concept of "contemporaneous" associations to anything that is close in time to his trial. We disagree. "Contemporaneous" is defined as "[l]iving, occurring, or existing *at the same time*." (Emphasis added.) Black's Law Dictionary (11th ed.

2019). In relation to the offers of proof elicited in the circuit court, defendant fails to cite authority establishing that evidence of a relationship after the fact supports the finding of a *per se* conflict, and our research has also found none. Accordingly, the circuit court did not err in sustaining the relevancy objection to testimony and excluding evidence that was not contemporaneous with defendant's prosecution.

¶ 77        Without engaging the merits of the procedurally defaulted argument, we note that, even if Campbell did labor under a *per se* conflict due to her contemporaneous relationship with Foster, including her later assistance with the election campaign, this would not end our analysis. Our supreme court has rejected the blanket disqualification of members of a public defender's office due to a *per se* conflict of an individual attorney. *People v. Miller*, 79 Ill. 2d 454, 462 (1980). Rather, it has opted for "a case-by-case inquiry *** whereby it is determined whether any facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office." *Id.* In other words, despite defendant's representations that a "*per se* conflict is automatic grounds for reversal unless [defendant] waived the conflict," this situation represents an exception to the general rule, and Campbell's conflict would not automatically be imputed to Barnes and McEldowney or constitute grounds for automatic reversal where she did not personally represent defendant.

¶ 78        Defendant rejects this application of precedent, arguing that this court decided in the previous appeal "that the nature of Campbell's *per se* conflict of interest precluded the assistant public defenders that she supervised from representing defendant." *Boswell*, 2020 IL App (4th) 180165, ¶ 24. Again, in the prior appeal, we were required to take the allegations that Campbell assisted in the prosecution as true; we were not deciding whether Campbell's personal "association" with Foster or assistance with Foster's primary election resulted in a *per se* conflict

that could be imputed to McEldowney and Barnes. Indeed, how could we have so decided when that argument was not before us? Instead, we emphasized that, on the facts assumed as true, "our holding that Campbell's alleged *per se* conflict disqualified the assistant public defenders in her office from representing defendant is limited to the particular facts of this case." *Id.* ¶ 25. Following the third-stage evidentiary hearing, important facts that we previously assumed as true have now been found *not* to be true, and additional facts, unknown in the prior appeal, appear in the record.

¶ 79       The evidence in this case demonstrated that Campbell was aware of a potential conflict in defendant's case due to her position in the state's attorney's office when defendant was charged just prior to her becoming chief public defender. Due to this potential conflict, she appointed the first assistant public defender to supervise the case, effectively screening herself from the defense. McEldowney testified that Campbell was not involved in the case and that neither he nor Barnes reported to Campbell or sought her guidance for decisions made at defendant's trial. McEldowney also testified that Campbell's position as supervisor would not have impeded his decision to act. Barnes stated in her affidavit: "None of the decisions I made or actions that I took or elected not to take in the defendant's case were in any way driven by, altered, impaired, or otherwise affected by Campbell's role as Public Defender, *** or her relationship with [ ] Foster." Campbell denied accessing defendant's case file, and McEldowney stated he had no reason to believe she had done so. Further, "the fact that the appointed public defender has supervisory authority over his or her assistant public defenders does not override an assistant public defender's undivided loyalty to [the] client." *People v. Cole*, 2017 IL 120997, ¶ 42. Having found that Campbell did not assist in defendant's prosecution and screened herself from his defense, the facts presented regarding a contemporaneous relationship would not warrant the

disqualification of every member of the public defender's office, even if Campbell herself had a *per se* conflict. See *Spreitzer*, 123 Ill. 2d at 22 (finding allegations of conflicting loyalty of trial counsel due to conflict of another attorney in public defender's office that are speculative and remote insufficient).

¶ 80        Moreover, while we have examined the arguments relating to Campbell's alleged assistance in defendant's prosecution and her contemporaneous relationship with Foster independently, we have considered the totality of the evidence and find that even when the arguments are combined, the quantum of evidence provided still does not result in a finding that a *per se* conflict existed.

¶ 81                        B. Actual Conflict of Interest

¶ 82        Defendant's failure to prove a *per se* conflict does not end our inquiry, as "a defendant may still establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *People v. Hernandez*, 231 Ill. 2d 134, 144 (2008). "To establish an actual conflict of interest, a defendant must identify an actual conflict that adversely affected his counsel's performance." *Yost*, 2021 IL 126187, ¶ 38. A deficiency in counsel's strategy, tactics, or decision-making that is attributable to the alleged conflict must be specifically identified as speculation and conjecture are insufficient. *Id.*

¶ 83        Defendant argues that Barnes's failure to bring Campbell's comment—which he argues presents a *per se* conflict—to the attention of the trial court constitutes a specific deficiency in Barnes's performance as counsel. He points to the following excerpt from *Hernandez* as support.

> "We caution attorneys in the future and remind them of their obligation to bring to
> the trial court's attention any facts or circumstances that may create a conflict of

interest. Bringing the situation to the trial court's attention would have provided the court with an opportunity to explain the circumstances and ramifications to defendant. Defendant could have made an informed decision about the situation and the conflict could have been waived had defendant so desired. Defendant was not afforded this opportunity in the case at bar because the attorneys never advised defendant or the trial court of the facts." *Hernandez*, 231 Ill. 2d at 152.

¶ 84     The court in *Hernandez* issued this admonishment as an "aside" after it had decided that a *per se* conflict of interest existed as a result of known dual representation. *Id.* at 138-39, 152. The court took issue with the parties disposing of that known conflict by agreement without informing the court or the defendant. Here, on the other hand, the factual premise of the supposed *per se* conflict is the statement of McBride, who never claimed to have firsthand knowledge of its truth. The statement she ascribed to Campbell was ambiguous and subject to misinterpretation, and Barnes herself did not believe it to be true. As we now know from the circuit court's findings and the evidence presented below, Barnes was right. We do not believe that *Hernandez* requires every potential implication of conflict to be reported where, as here, there is such clear doubt about its veracity. *Hernandez* did not create a bright line rule where a failure to report in and of itself establishes an actual conflict of interest, regardless of the improbability of the information received.

¶ 85     Again, defendant relies on the opinion in the previous appeal, where the court stated that the allegations in McBride's affidavit "support an inference that there was a defect in Barnes's decision-making that was attributable to her conflicting loyalties to defendant and her employer." *Boswell*, 2020 IL App (4th) 180165, ¶ 26. Defendant argues that "[t]his [c]ourt's inference was not rebutted at the evidentiary hearing." Once again, the court in the previous appeal was making

these statements without the benefit of the evidence and testimony presented during the third-stage evidentiary hearing. Barnes submitted an affidavit swearing her loyalties were not divided and that Campbell's position did not impact her representation of defendant. She simply did not believe the statement carried the nefarious meaning attributed to it by defendant and McBride, and the other evidence introduced at the hearing supports her conclusion. Further, inferences arise from the evidence presented to the trier of fact, and not for the first time in a reviewing court. See *People v. Funches*, 212 Ill. 2d 334, 340 (2004) (noting "an inference is merely a deduction that the fact finder may draw in its discretion, but is not required to draw as a matter of law"). The same inferences that rationally flowed from the allegations in defendant's petition do not naturally arise for the evidence following the evidentiary hearing. Defendant also conflates the impact of an inference with that of a presumption, as " '[i]nferences are by their nature permissive, not mandatory.' " *Id.* at 341 (quoting 1 Clifford S. Fishman, Jones on Evidence: Civil & Criminal § 4:1, at 299 (7th ed. 1992)).

¶ 86        We also note the chain of defendant's logic seems to get tangled in itself. He alleges that the information McBride shared with Barnes showed a *per se* conflict on the part of Campbell. However, even where the comments are found not to represent a *per se* conflict, Barnes still labored under an actual conflict where she failed to bring the comments to the trial court's attention. This suggested result is untenable. Given our finding above that the allegations of McBride do not support a *per se* conflict, Barnes's performance could not have been deficient for failing to bring those allegations to the attention of the court.

¶ 87        Finally, defendant is less than clear about what the course below would have been if Barnes had brought Campbell's comment to the attention of the court. At best, one suspects that the result would have been an evidentiary hearing to look into the accuracy and meaning of the

comment. Ultimately, that is *exactly* what happened here at the third-stage hearing. In an indirect way, defendant has already obtained the relief that he argues he should have received before, though the ultimate outcome is unfavorable to him on these issues.

¶ 88　　　　In light of the circuit court's ruling and our analysis above, we are unable to conclude that Barnes's failure to bring McBride's allegations to the attention of the trial court was in fact a deficiency in her representation of defendant. Accordingly, defendant has failed to show an error that is clearly evident, plain, and indisputable.

¶ 89　　　　　　　　　　　　　　III. CONCLUSION

¶ 90　　　　It is difficult to imagine something more corrosive to our justice system than a defense attorney working to assist the prosecution. Due to allegations of this nature made in the prior appeal—which we necessarily accepted as true in that posture—we ordered that an evidentiary hearing be conducted to get to the bottom of such explosive claims. That hearing has now occurred, and the circuit court has found that such a collaboration simply did not occur. The whole affair appears to be, at best, a mistakenly literal interpretation of an offhand comment. These conclusions are supported by the evidence and, perhaps reassuringly, put the matter to rest.

¶ 91　　　　For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 92　　　　Affirmed.

*People v. Boswell*, 2023 IL App (4th) 220754

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 10-CF-1117; the Hon. Roger Thomson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Erika Reynolds, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |