2023 IL App (2d) 220096
No. 2-22-0096
Opinion filed August 24, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-CF-1550 |
| | ) | |
| ANTHONY MARCUS, | ) | Honorable |
| | ) | Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Jorgensen and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Anthony Marcus, appeals the circuit court of Lake County's dismissal of his postconviction petition after an evidentiary hearing at the third stage of the proceedings. On appeal, defendant argues that the trial court erred by dismissing his petition, because he made a substantial showing that he was denied effective assistance of counsel. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3     On June 8, 2014, defendant strangled to death his wife, Sun Marcus, and his physically impaired 17-year-old daughter and then attempted suicide. The State charged defendant by way of an 18-count indictment. Each count alleged first degree murder (720 ILCS 5/9-1(a)(1), 9-1(a)(2)

(West 2014)) and sought a term of either life and or 60 to 100 years' imprisonment, based on certain aggravating factors.

¶ 4                                           A. Plea Hearing

¶ 5     On February 9, 2015, in the presence of defendant and his counsel, public defender Joy Gossman and assistant public defender Keith Grant, the State presented a negotiated agreement to the trial court. In exchange for defendant's plea of guilty but mentally ill to one count of first degree murder, the State agreed to nol-pros the remaining counts against defendant and recommend a term of 45 years' imprisonment. Grant told the trial court, the Honorable George Bridges, presiding, that, in support of the plea of guilty but mentally ill, he had filed the report of psychiatrist Dr. Henry Conroe, dated January 28, 2015. The following colloquy occurred:

"MR GRANT [(DEFENSE COUNSEL)]: I was saying, your Honor, as to the plea of guilty but mentally ill, we have filed a January 28, 2015 report of Dr. Henry Conroe, a licensed psychiatrist in the State of Illinois who has conducted a full and complete evaluation of [defendant], and who, in the course of that report, finds [defendant] to have been suffering from major depressive disorder as defined by the DSMV at the time of this alleged offense. We believe that meets the requirements for a guilty but mentally ill plea. We would offer Dr. Conroe's report by way of hearing in this matter. I believe we would have a stipulation as to the content of that report and ask the court to make a finding that in fact [defendant] did in fact suffer from a mental illness at the time of the offense.

THE COURT: And so the parties are asking that the report by Dr. Conroe be admitted as part of the matters the court would consider with the factual basis; is that correct?

MR. DEMARTINI [(PROSECUTOR)]: Yes, Judge. In terms under the statute, we can have a hearing and both sides would stipulate to the psychological expertise of Dr.

Conroe and the finding—the psychological finding in that report, but I believe we would agree not to the legal conclusions, but the psychological conclusions.

* * *

MR. GRANT: *** The primary finding that we are focused on here is at the time of the offense, [defendant] suffered from major depressive disorder as defined by DSMV.

THE COURT: *** [A]nd I know there was never an issue raised regarding *bona fide* doubt of the defendant's fitness, and that the defendant appeared in front of this court on a number of occasions, and there's been no observations by the court that would give this court concern so that we can address the issue of fitness. And in the report there's—it's addressed that the defendant is aware of his spheres and he is fit.

You would agree you would have no bona fide doubt of fitness; is that correct?" With that, Grant and the prosecutor agreed that defendant was fit.

"THE COURT: Very well. Mr. Marcus, did you hear what was just represented to the court as being the negotiation in this case?

THE DEFENDANT: Yes, your Honor."

¶ 6    The court admonished defendant, stating, "you could continue to persist in your plea of not guilty to [these charges]. You would be entitled to and would receive a fair trial." The court explained to defendant that the State would present witnesses to testify and that he would have the opportunity to "confront," cross-examine, and "challenge" the witnesses; he would have the right to call his own witnesses and to testify on his own behalf; and the State would have to prove him guilty beyond a reasonable doubt. Defendant indicated that he understood. The court then stated, "if I say anything that you don't understand, please stop me and let me know so that I can rephrase. I want to make sure you understand what it is that I'm advising you of here now." Defendant replied, "Yes, sir." The court explained to defendant what a jury trial is, and defendant stated that

he understood. The court also explained what a bench trial is, and defendant stated that he understood. The court explained that by pleading guilty he was "giving up" his right to have a jury or bench trial. Defendant stated that he understood.

¶ 7     The following colloquy then occurred:

"THE COURT: You understand this is not like—this is not the same as a verdict of not guilty by reason of insanity where you would be absolved of the criminal responsibility? You understand that?

THE DEFENDANT: Yes, your Honor.

\* \* \*

THE COURT: Have you had a sufficient amount of time to discuss this case and the negotiation with your attorney?

THE DEFENDANT: Yes, I have, your Honor.

THE COURT: And has your attorney answered to your satisfaction all of the questions that you have concerning this case and the negotiation?

THE DEFENDANT: Yes, they have, your Honor.

THE COURT: As you stand here this morning, is there any question you wish to have answered that has not yet been answered, and you wish to have answered, and you wish to have that question or those questions answered before you continue with your plea of guilty to this charge?

THE DEFENDANT: I have no questions, your Honor."

¶ 8     The parties then stipulated to the factual basis for the plea: on June 8, 2014, defendant "without lawful justification, strangled Sun Marcus, knowing that the act created a strong probability of death or great bodily harm to Sun Marcus, and that the action caused [her] death." The following colloquy then occurred:

"THE COURT: Very well. The Court has accepted Dr. Conroe's report and the stipulation regarding his qualifications[,] and I do find in this case here, that the defendant was suffering from a mental illness at the time of the offense for which he is entering this plea of guilty but mentally ill. You agree with those factual basis [*sic*] and the findings of Dr. Conroe; is that correct, Mr. Marcus?

THE DEFENDANT: Yes, your honor.

THE COURT: And you understand I asked you earlier about your attorneys filing motions on your behalf. You understand that this court has reviewed Dr. Conroe's report, and you are in agreement that you are not asking them to file on your behalf any pleadings, motions, to have you found—or rather to be acquitted by reasons [*sic*] of insanity, you agree with that?

THE DEFENDANT: Yes, I do.

THE COURT: So you agree that you have this mental illness as Dr. Conroe has found, and you agree also that at the time of the crime in this case, you in fact were sane; is that correct?

THE DEFENDANT: I don't understand the question.

THE COURT: In other words, I'm trying to make sure that you have had discussions with your attorney about the ability to raise an insanity defense. And so you have had those questions and conversations with your attorney; is that correct?

THE DEFENDANT: Yes, your Honor.

THE COURT: *And you have reviewed and discussed Dr. Conroe's report; is that correct?*

THE DEFENDANT: *Yes, your Honor.*

THE COURT: *And you are in agreement that you are not asking your attorney to file motions, pleadings or the defense of insanity for you; is that correct?*

THE DEFENDANT: *That is correct, you Honor.*

THE COURT: *And you understand you could*—and that's why I asked about speaking with other witnesses. You could call other experts to assist you in raising this defense of insanity. You understand that?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: And you're not willing—or you're not asking for that; is that correct?

THE DEFENDANT: That is correct. Your Honor." (Emphases added.)

¶ 9 Defendant told the court that he had signed the "waiver of trial form," that the form was explained to him by his attorney, that he understood the form, and that no one had threatened or forced him to get him to plead guilty. Defendant told the court that he wished to give up his right to a jury or bench trial and to plead guilty to first degree murder and be sentenced to 20 to 60 years of imprisonment to be served at 100%. The court found that defendant knowingly and intelligently waived his right to a trial and voluntarily entered into a guilty plea and that there was an adequate factual basis to support the plea.

¶ 10 The court further found that defendant suffered from a substantial disorder of thought, mood, and behavior that afflicted him at the time of the commission of the offense and impaired his judgment. The court accepted the guilty but mentally ill plea and sentenced defendant to 45 years' imprisonment.

¶ 11                                  B. Postconviction Petition

¶ 12 Defendant did not move to withdraw his guilty plea or file a direct appeal. However, in February 2018, defendant filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725

ILCS 5/122-1 to 122-7 (West 2018)), alleging that he was denied effective assistance of counsel in connection with the entry of his plea of guilty but mentally ill. Defendant alleged that counsel dissuaded him from raising an insanity defense—despite knowing that such a defense was justified—and counsel concealed the opinions of two mental health experts who supported an insanity defense. Defendant alleged that, had he known that an insanity defense was supported, he would not have pleaded guilty and would have insisted on going to trial.

¶ 13    Defendant attached Dr. Conroe's report, in which the doctor stated that, to assess defendant's state of mind on the day of the murders, he interviewed defendant twice, for four hours; he interviewed defendant's surviving daughter, Michelle; and he reviewed health records, police reports, photos, grand jury proceedings, defendant's 911 call on the date of the offenses, and defense counsel's summary report. Dr. Conroe opined "to a reasonable degree of medical and psychiatric certainty, [defendant] suffered from Major Depression, Severe with mood-congruent psychotic features." Dr. Conroe's report further indicated: "The defendant had no history of violence, criminal behavior or significant marital issues. His daughter described him as being a loving father and husband."

¶ 14    Dr. Conroe described defendant as a 54-year-old married man with two children. Defendant had been employed as a government contractor who operated and maintained the Shipboard Training Simulator at Great Lakes Naval Station. The report stated that, six months before the murders, defendant took a higher-level position with his company that included laying people off to reduce payroll. Defendant began to work 60 to 80 hours per week. Despite having little debt, defendant felt like he had to make more money to care for his physically impaired daughter.

¶ 15    Dr. Conroe reported that defendant found his new position stressful and demanding. Defendant had difficulty sleeping. He suffered numerous panic attacks, including one a week and

a half before the murders, when he quit his job. During that week and a half, defendant went to the emergency room twice for symptoms consistent with stress. After the second visit to the emergency room, defendant made an appointment with a psychiatrist, for the end of June.

¶ 16    Dr. Conroe opined that on the day of the murders, "due to [defendant's] depression with psychosis in the form of delusions, [defendant] lacked substantial capacity to appreciate the criminality of his actions towards his wife and daughter." Dr. Conroe stated:

> "[Defendant] defined a plea bargain as his lawyer and the State's Attorney trying to agree upon a sentence without a trial. [Defendant] said that an insanity plea in [*sic*] one in which he states that 'I was not in my right mind when this occurred.' At this point, *[defendant] told me that he does not want his case to go to trial. He does not want his daughter and his family involved in a trial that would hurt them and risk exposing his daughter to testimony against him, such as the autopsies of the victims. Regarding his daughter Michelle, [defendant] told me that 'she's damaged, and she doesn't need to be damaged anymore.'* " (Emphasis added.)

¶ 17    Defendant also alleged that he discovered through postconviction counsel that Grant had withheld the opinion of clinical psychologist Dr. Michael Kovar, whose opinion also supported an insanity defense.

¶ 18    In May 2018, the postconviction court, the Honorable Patricia S. Fix, presiding, ordered the matter to proceed to second-stage proceedings under the Act. Thereafter, the State moved to dismiss the petition and defendant filed a response. The court denied the State's motion and ordered a third-stage evidentiary hearing.

¶ 19                    C. Third-Stage Evidentiary Hearing

¶ 20    At the hearing, defendant testified as follows. Defendant described himself as a detail-oriented, analytical person who is "always contemplating" and does not make split-second

decisions. He had a 22-year career in the Navy and was honorably discharged in 1997. In 2014 he worked for a federal contractor, and in late May he quit his job because he worked 20 hours a day and it affected his mental state. Defendant could not relax or sleep. After he quit his job, things did not get better. Instead, defendant went to the emergency room at the veteran's administration (VA) hospital on May 30 and in early June 2014 because he felt pains throughout his body and thought he was having a heart attack. During the first hospital visit, after a physical exam, defendant spoke with a psychiatrist because he was having "ideations of suicide." Defendant was released from the hospital the same day. After the second visit to the hospital, defendant followed up with his general practitioner and saw her on June 6, 2014. The general practitioner referred defendant to a psychiatrist, and defendant made an appointment for June 22 or 23, 2014, but defendant was arrested before he could keep the appointment.

¶ 21 Defendant also testified that he met his attorneys Grant and Gossman early during his pretrial detention after his arrest on June 8, 2014. He was on suicide watch the entire month of June. After that, he remained depressed, had feelings of dread, and had panic attacks. Defendant mostly met with Grant. He met with Grant several times before his plea of guilty but mentally ill. Defendant also met with social worker Sara Price twice a week. In early June, defendant also met with Dr. Kovar. Defendant's attorneys told him that Dr. Kovar was assigned to conduct a mental evaluation of him "to see what [his] state of mind was at the time of the crime." Defendant said that he and Grant talked "about the possibility of an insanity defense," adding, "That would be the most likely defense, you know, that I could pursue." Grant gave defendant a description of what an insanity defense was and how it would be presented to a jury. Grant also told defendant "time after time" that juries in Lake County do not acquit on insanity cases. Grant made these statements before defendant's second meeting with Dr. Kovar. Defendant wanted to review his VA medical records with Grant. Grant responded that the VA would have to sign some document admitting

partial liability or words to that effect. Defendant believed that Grant was "slamming the door" on the use of this information.

¶ 22    Defendant testified that he wanted a bench trial because "this was an emotional case for everybody. And juries are people too. *** I thought I would have a better chance of meeting *** my goals of a trial with a—you know one wise old judge instead of, you know, 12 emotional people." Defendant told Grant that he preferred a bench trial. Grant told defendant that he could have a bench trial but that an insanity defense had to be tried in front of a jury.

¶ 23    Defendant testified that in July 2014 he told Grant and Price that he was concerned about how a trial would affect Michelle. He was concerned for her well-being because she had been through enough with the loss of her mother and sister. Defendant expressed these concerns to Price more than five times. Defendant told Grant and Price that he felt the case was tearing his family into two different sides. Defendant also told Grant and Price that he loved his family and he hated being the one making them choose sides. Defendant asked Grant whether a trial could be closed to the public, and Grant replied that trials are open to the public. He also asked Grant whether the media would be allowed in the courtroom and Grant replied, yes. Defendant testified that he was concerned about the media.

¶ 24    Defendant testified that in July 2014 he told Grant and Gossman that he wanted to plead guilty to both charges of first degree murder but Grant told him to wait until they got the mental health evaluation. Defendant also told Grant that he did not want to look at autopsy photos, but he did not tell Grant that he did not want to look at other discovery. When he asked Grant and Gossman for discovery, they told him that Illinois Supreme Court Rule 415(c) (eff. Oct. 1, 1971) precluded defendants from obtaining discovery in jail.

¶ 25    Defendant testified that in July or August he asked Grant when Dr. Kovar would be back to see him. Grant told defendant either that he was trying to get in contact with Dr. Kovar or that

he would call Dr. Kovar. Defendant told Grant that he thought Dr. Kovar's report would be critical to any defense he wanted to make. Grant never told defendant that Dr. Kovar told him that an insanity defense appeared to be supported. If Grant had told defendant in October that Dr. Kovar believed an insanity defense appeared to be supported, defendant would have "look[ed] more into taking this to trial." In October, defendant told Grant he wanted to pursue the possibility of pleading guilty but mentally ill, but, he testified, "that decision was never set in stone."

¶ 26    Defendant testified that, before his second meeting with Dr. Kovar on November 4, 2014, he expressed to Grant hesitation about moving forward with a guilty plea. On November 4, he told Dr. Kovar that he did not want to take his case to trial because, with the information he had, "that appeared to be the most prudent thing to do." When asked why, defendant testified:

> "Because I believed that I was insane at the time of the crime, but nobody else seemed to believe it or to voice that opinion to me. And I felt I was all alone, and I did not want to go to trial, unarmed, having to face a jury without having, you know, some semblance of [a] defense primarily from, you know, an expert witness stating what my state of mind was at the time of the crime."

¶ 27    Defendant testified that, two days after his November 4, 2014, meeting, Grant told him that he had "terminated" Dr. Kovar because Dr. Kovar was dragging his feet. Dr. Conroe was brought in to assess defendant's state of mind at the time of the crime. Defendant asked Grant to obtain Dr. Kovar's notes for Dr. Conroe and Grant told him that was not going to happen. Defendant met with Dr. Conroe in early December.

¶ 28    Defendant testified that, from December 2014 into January 2015, he was trying to gather his own evidence and look into the events at the VA hospital prior to the murders. He was hampered by the lack of a functioning research computer terminal at the jail. Defendant filed a grievance about the broken equipment at the jail.

¶ 29    Defendant testified that, on February 3, 2015, Grant and Gossman presented defendant with the State's offer of a plea deal for 45 years' imprisonment. Defendant did not agree to the offer. He wanted to counter with 25 to 30 years. During the meeting, Dr. Conroe's report did not come up.

¶ 30    During defendant's meeting with Grant and Gossman on February 5, 2015, they told defendant that the State rejected his counteroffer. They explained the jury waiver and waiver of a presentence investigation report. Gossman read the jury waiver form to defendant, and defendant signed it. Defendant asked Grant and Gossman when Dr. Conroe's report was going to be available. They replied that they were still waiting for it.

¶ 31    Defendant met with Grant again before the plea hearing. Grant told defendant that he read Dr. Conroe's report and that it validated a guilty but mentally ill plea. Grant did not tell defendant anything else about the report. When defendant asked Grant if he had a copy of the report, Grant said, no. At no point prior to his plea did either Grant or Gossman tell defendant that Dr. Conroe opined that he met the definition of being legally insane at the time of the offenses. Defendant accepted the plea deal because he felt he would be harming his family by going through with a trial and, without evidence supporting an insanity defense, he had no choice other than to accept the plea. Defendant testified that, if he would have known of Dr. Conroe's opinion, he would not have pleaded guilty but mentally ill. He would still be concerned for his family, but going to trial would have been worth it.

¶ 32    Defendant testified that he did not recall why he told the judge at his plea hearing that he did not believe that any defenses should be raised or that he did not wish to speak to any expert. Defendant informed the judge that he had reviewed Dr. Conroe's report, but that review was based on his earlier discussion with Grant about the report. Defendant said that, although he believed that he was being pressured into pleading guilty, he "froze," and that is why he told the judge that

he was not being forced to enter the plea. Defendant testified that he was unprepared and caught off guard by the judge's questions.

¶ 33    Defendant testified that he never complained to Gossman about Grant's representation. Defendant did not complain to Drs. Kovar or Conroe that counsel was pressuring him to plead guilty but mentally ill. In his eight appearances before the plea hearing court, defendant testified that he did not complain to the judge about counsel's representation because he was not aware that he could speak out. After defendant pleaded guilty and before his removal to the department of corrections, defendant met with Price three times. Defendant complained to Price about his shackles and about the presence of the press, but he did not complain that he had been coerced into pleading guilty.

¶ 34    Grant testified as follows. The first day defendant's case came to court, Grant and Gossman were appointed to represent defendant. Both attorneys agreed that Grant was defendant's primary counsel. When Grant met with defendant the same day, defendant wore a "suicide gown."

¶ 35    Within a day or two of being assigned to defendant's case, Grant retained Dr. Michael Kovar to assess defendant's psychological status at the time of the offense and his fitness to stand trial. Grant wanted Dr. Kovar to assist in determining whether there was a viable insanity defense. Dr. Kovar first interviewed defendant for an evaluation within a few days after his arrest, and then again five months later. Grant, Gossman, and Price met with defendant almost every day during the initial weeks of defendant's pretrial detention.

¶ 36    Grant testified that he and defendant repeatedly discussed what it would take to establish that defendant was insane at the time of the offense. Grant reviewed with defendant the structure of a trial and the witnesses that would be needed to support an insanity defense. At one point, defendant asked Grant if his trial could be closed to his family, the public, and the media. Grant told defendant that this would be unlikely.

¶ 37 Grant denied telling defendant that he was going to spend the rest of his life in prison, that if he insisted on a trial his family would be dragged through the mud, and that pleading insanity was a waste of time.

¶ 38 On September 24, 2014, Grant received an e-mail from Price, stating that defendant "would like to speak to you, at your earliest convenience, about not taking the case to trial. He thinks he mentioned it to [Gossman] and [*sic*] his last interaction and he wants to make sure that you have heard his thoughts about this idea." After discussions with defendant, Grant initiated plea negotiations with the State.

¶ 39 Grant testified that, as of September 30, 2014, Dr. Kovar had not completed his evaluation of defendant. Dr. Kovar provided different reasons for not completing the report: other professional requirements, personal matters, other cases taking precedence, and having house guests over the holidays. On October 20, 2014, Dr. Kovar told Grant that an insanity defense appeared to be supported. Grant told Dr. Kovar that defendant did not want to go to trial, but he denied telling Dr. Kovar that defendant did not want an acquittal based on an insanity defense. Grant may have told Dr. Kovar that, in the context of not taking the case to trial on an insanity defense, a finding of guilty but mentally ill was best for defendant. Grant told Dr. Kovar that in his experience it was difficult to establish an affirmative defense of insanity. Grant did not tell Dr. Kovar to limit the scope of his evaluation. Grant told Dr. Kovar that he needed evidence that defendant was mentally ill at the time of the offenses. Grant never told Dr. Kovar not to write in his report that insanity was a viable defense. On October 22, 2014, Grant told Dr. Kovar that he needed him to complete his evaluation and to provide his opinion and that, if his opinion was that defendant was insane at the time of the offense, he should write that in his report.

¶ 40 On October 30, 2014, Grant received an e-mail from Price stating:

"FYI. When I saw [defendant] today, he mentioned the communications between his family and the VA. He wants to discuss this more with you, in terms of how it could affect the case, if at all. I think he is still having a hard time making a firm decision about not taking the case to trial in case there happens to be any reason to reopen the case in the future."

¶ 41 Grant testified that defendant told Grant that he wanted his case resolved before the holidays. By November 2014, Dr. Kovar had not completed his report and he did not know when it would be completed. Grant terminated Dr. Kovar and hired Dr. Conroe to conduct an evaluation of defendant's fitness and determine whether there was a mental health component to the offense, including the possibility of an insanity defense.

¶ 42 Grant testified that, before Dr. Conroe wrote his report, he told Grant, " 'I'm sorry, but I think I'm going to end up doing the same thing you didn't want Kovar to do,' " meaning that his report would also support an insanity defense. Grant replied to Dr. Conroe, "That's fine. Write a report. Give me your opinion." Dr. Conroe tendered his report, dated January 28, 2015.

¶ 43 On January 29, 2015, Grant received an offer from the State that defendant eventually accepted: to plead guilty but mentally ill for one charge of first degree murder, with a sentence of 45 years in prison. Grant testified that the Thursday (February 5, 2015) before the plea hearing, he and Gossman reviewed Dr. Conroe's report with defendant. Grant read out loud to defendant Dr. Conroe's finding that defendant was insane at the time of the offenses. Grant explained to defendant that this finding supported an insanity defense, "if that's what they chose to do." Grant did not document in his notes that he read Dr. Conroe's findings to defendant or that he reviewed with defendant a possible insanity defense. Grant did not take concurrent notes of his meetings with defendant, and whatever notes he took were general reminders of things he needed to do in

the future. Grant testified that he never pushed defendant to enter a plea of guilty but mentally ill or any plea.

¶ 44    Gossman testified as follows. Gossman assigned defendant's case to Grant and supervised him. She met with defendant about six times throughout the proceedings. Gossman testified that in June 2014 defendant told her that he did not think he would be found not guilty. In July 2014, defendant told Gossman and Grant that he did not want the case taken to trial. In September 2014, Grant and Price told Gossman that defendant indicated that he did not want to take the case to trial. Rather, defendant hoped to have the case resolved by the holidays because he did not want to put his daughter Michelle through a trial, especially while she was planning her wedding. He also did not want to review the autopsy and crime-scene photos and did not want his family to see them.

¶ 45    Gossman testified that she and Grant met with defendant on February 3, 2015. Defendant asked for a copy of his discovery. Gossman explained to defendant why he could not have a copy of his discovery. Gossman and Grant told defendant about the State's plea offer, which defendant wanted to counter.

¶ 46    Gossman testified that, when she and Grant met with defendant on Thursday, February 5, 2015, Gossman told defendant that the State had rejected his counteroffer. Gossman discussed the jury waiver with defendant and had him read it, and defendant signed it. They also discussed the presentence report and whether to waive it. Gossman did not recall if Grant provided defendant with a copy of Dr. Conroe's report. Gossman testified that she "believed" Grant referred to Dr. Conroe's report while speaking with defendant on either February 3 or 5, 2015, but she did not specifically recall what Grant said about it. She did not recall Grant reading the report to defendant or telling defendant that Dr. Conroe offered the opinion that he met the definition of insanity at the time of the offenses. During these meetings, Gossman took notes, but her testimony was based on

her independent recollection. Gossman's notes do not indicate that Grant discussed Dr. Conroe's report with defendant.

¶ 47    Price testified that she met with defendant almost 70 times while he was in pretrial detention in the Lake County Jail. According to Price, defendant told her many times that he did not want to take his case to trial. Defendant expressed confusion about what to do only once or twice. Price testified, "I think for the most part, he was pretty set on having a plea as opposed to a trial." Defendant did not want Michelle to go through a trial, and he wanted to finish things as early as possible.

¶ 48    Dr. Kovar testified as follows. Grant hired him to examine defendant to determine whether he met the statutory definition of insanity. Dr. Kovar first examined defendant during the first week after the murders. During Dr. Kovar's second visit with defendant, in October 2014, defendant indicated that he did not want to go to trial and that he wanted to plead guilty, to spare his family grief and not open old wounds. Also, on October 20, 2014, Grant told Dr. Kovar that he had discussed all options with defendant. Grant also told Dr. Kovar that defendant did not want to go to trial and did not want "an insanity acquittal" and that they were going to go with a guilty but mentally ill plea. Dr. Kovar told Grant that an insanity defense appeared to be supported. Grant replied to Dr. Kovar, "it's a straight uphill fight to win an insanity defense in Lake County" in a case where the defendant kills his own family members. Grant told Dr. Kovar to limit his examination of defendant to determine whether defendant was mentally ill. Grant told Dr. Kovar that " [Grant and Gossman] are chomping at the bit" to get a plea deal done.

¶ 49    Dr. Kovar testified that, during a conversation on October 22, 2014, Grant told him that he wanted an evaluation of defendant that would conclude that defendant was mentally ill at the time of the offense and, beyond that, anything else was up to Dr. Kovar. Grant told Dr. Kovar that he "did not need a Cadillac, that a Chevy would do." During a conversation on November 7, 2014,

Grant told Dr. Kovar that he had things exactly where he wanted them and the only thing holding up the works was Dr. Kovar's evaluation and report. Grant pressured Dr. Kovar to complete his report and told Dr. Kovar that he did not want to do anything to "queer the deal." Dr. Kovar told Grant that the report would not be completed for another two months. Dr. Kovar testified that he ultimately withdrew from defendant's case because of the level of acrimony between himself and Grant.

¶ 50    On March 4, 2022, the postconviction court denied defendant's petition, issuing a memorandum opinion and order. The court found, in part, that defendant failed to prove that Grant failed to disclose Dr. Conroe's finding of insanity to defendant, attempted to direct Drs. Kovar and Conroe to provide opinions supporting only a guilty but mentally ill plea, or manipulated and dissuaded defendant from utilizing an insanity defense. The court found "incredible" defendant's testimony that he did not understand all the questions the plea hearing court asked him. The court concluded that defendant failed to meet his burden of proving the deficient performance prong of his ineffective assistance of counsel claim.

¶ 51    The postconviction court also found that defendant failed to establish the prejudice prong of his claim, for the following reasons. The evidence "overwhelmingly reflects" that defendant sought to avoid a trial and that the availability of an insanity defense was immaterial to him because of his desire to avoid further trauma to his daughter. The court noted that defendant told the plea hearing court that he had reviewed Dr. Conroe's report with counsel and that he did not seek to raise the defense of insanity. The court found that defendant failed to prove any reasonable probability that he would not have pleaded guilty and would have insisted on going to trial, concluding that this failure to establish prejudice precluded a finding of ineffective assistance of counsel.

¶ 52    Defendant filed a timely notice of appeal on March 22, 2022.

¶ 53                                II. ANALYSIS

¶ 54    The relevant inquiry before this court on appeal is whether the postconviction court properly denied defendant's postconviction petition after an evidentiary hearing at the third stage of the proceedings.

¶ 55    Defendant argues that he was denied effective assistance of counsel because Grant withheld the experts' opinions that supported an insanity defense. Defendant contends that, had he known of those opinions, he would have rejected the State's plea offer and gone to trial, asserting an insanity defense. Defendant asks us to reverse the postconviction court's denial of his postconviction petition, vacate his conviction, and withdraw his plea of guilty but mentally ill.

¶ 56    The State counters that the record affirmatively rebuts defendant's assertions. The postconviction court found that defendant was not credible, his own conduct prior to and during his plea hearing contradict his claims, and counsel offered him competent advice.

¶ 57    The Act allows a criminal defendant to assert in a petition that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2018). The Act provides a three-stage mechanism for a defendant to advance such a claim. *People v. Addison*, 2023 IL 127119, ¶ 18. At the first stage, the trial court independently reviews the petition and determines whether to dismiss it as frivolous or patently without merit. *Id.* If the petition is not summarily dismissed, it advances to the second stage, where the court may appoint an indigent defendant counsel and the State may either answer or move to dismiss the petition. *Id.*; 725 ILCS 5/122-4, 122-5 (West 2018). If the petition is not dismissed, it advances to a third-stage evidentiary hearing. *People v. Johnson*, 2021 IL 125738, ¶ 27.

¶ 58    Postconviction proceedings are collateral to proceedings in direct appeal and thus "focus on constitutional claims that have not and could not have been previously adjudicated." (Internal

quotation marks omitted.) *People v. Eubanks*, 2021 IL 126271, ¶ 29. A defendant's allegation that trial counsel rendered ineffective assistance is such a claim. *Id.*

¶ 59    When a postconviction petition advances to a third-stage evidentiary hearing, as in this case, the trial court conducts an evidentiary hearing and the defendant bears the burden of showing, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. The trial court acts as the finder of fact at the evidentiary hearing. *People v. Domagala*, 2013 IL 113688, ¶ 34. The court's factual findings and credibility determinations will not be disturbed unless they are "manifestly erroneous." *Eubanks*, 2021 IL 126271, ¶ 47. A decision is manifestly erroneous only if it contains error that is clearly evident, clearly plain, and indisputable. *Id.* At the evidentiary hearing, the defendant bears the burden of making a substantial showing of a deprivation of a constitutional right. *Id.* ¶ 29.

¶ 60    Here, defendant filed a postconviction petition alleging that defense counsel was ineffective because counsel pressured him to forgo an insanity defense and failed to inform him that two mental health experts opined that an insanity defense was supported. In addition, defendant alleged that, had he known about the experts' opinions, he would not have entered a guilty but mentally ill plea and, instead, would have insisted on a trial in which he asserted an insanity defense.

¶ 61    The sixth amendment guarantees criminal defendants the right to the effective assistance of counsel during the guilty-plea process. *People v. Brown*, 2017 IL 121681, ¶ 25. A defendant's challenge to a guilty plea based upon ineffective assistance of counsel is subject to the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), and therefore, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that this substandard performance prejudiced the defendant. *People v. Hall*, 217 Ill. 2d 324, 334-35 (2005). Counsel's conduct is deficient if he fails to ensure that the defendant entered the plea voluntarily and

intelligently. *People v. Rissley*, 206 Ill. 2d 403, 457 (2003). To establish prejudice, the defendant must show that there was a reasonable probability that, absent counsel's alleged errors, the defendant would have chosen not to plead guilty and insisted upon proceeding to trial. *People v. Hatter*, 2021 IL 125981, ¶ 26. "[A]t a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right." *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22.

¶ 62    Before this court, defendant argues that Grant's performance was deficient because he failed to disclose expert opinions supporting an insanity defense. Defendant notes that Dr. Conroe opined that he met the legal definition of insanity at the time of the offenses.

¶ 63    However, the postconviction court found that the evidence did not support defendant's contention that Grant failed to disclose Dr. Conroe's finding to him. The record supports the trial court's finding. Grant testified that, a few days before defendant's plea of guilty but mentally ill, Grant met with defendant and Gossman. Grant testified that, although he did not read Dr. Conroe's entire report to defendant, Grant read out loud to defendant that Dr. Conroe had determined defendant to be insane at the time of the offense. Grant explained to defendant, "that would have been an insanity defense if that's what we chose to do."

¶ 64    Further, defendant's own statements to the plea hearing court contradict his claims that he did not know that an expert supported an insanity defense, that he was not aware of the contents of Dr. Conroe's report, and that he had questions about the contents of the report. Defendant told the plea hearing court that he had reviewed Dr. Conroe's report. Defendant also told the court that he had discussed Dr. Conroe's report with counsel and he had no questions about the report or its contents. In addition, defendant told the court that he had discussed with counsel his ability to raise an insanity defense and that he did not want to be acquitted by reason of insanity. Although defendant testified at the hearing on the petition that he did not understand all of the plea hearing

court's questions, the postconviction court found defendant's testimony "incredible." The postconviction court reasoned that, at the hearing on his petition, defendant described himself as an organized thinker. The postconviction court's credibility finding is also supported by defendant's repeated confirmations during the plea hearing that he understood the plea hearing court's questions, and his agreement to ask that court questions if he did not understand something. Based on this evidence, the postconviction court found that defendant failed to prove by a preponderance of the evidence that Grant failed to disclose Dr. Conroe's report and opinion that an insanity defense was supported. We determine that the postconviction court's judgment in this regard is supported by the record and, giving deference to the court's credibility findings, determine that the judgment is not manifestly erroneous.

¶ 65    Defendant also contends that Grant's performance was deficient because Grant manipulated and pressured him into pleading guilty but mentally ill, by telling him that insanity defenses are difficult to win in Lake County. To establish deficient performance, a defendant must identify counsel's acts or omissions that allegedly are not the result of reasonable professional judgment and overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007); *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "A plea based on the reasonably competent advice of counsel is an intelligent plea not open to attack on the grounds that counsel erred in his judgment." *People v. Fuller*, 205 Ill. 2d 308, 330 (2002). However, counsel's conduct may be deficient where his advice is legally erroneous. For example, in *Hall*, 217 Ill. 2d at 335, our supreme court held that the defendant sufficiently alleged

deficient performance where the defendant relied on counsel's legally erroneous advice that he had no defense to the kidnapping charge and that he should plead guilty.

¶ 66    Here, defendant does not argue that Grant provided legally erroneous advice. Rather, he contends that Grant discouraged him from going to trial and dissuaded him from raising an insanity defense. Defendant notes that Grant told him that it was difficult to obtain an acquittal based on an insanity defense and Grant discouraged him from going to trial. We fail to understand how Grant's advice to defendant regarding the difficulty of obtaining an acquittal from the charges at issue can be viewed as anything but reasonably competent advice. Defendant provides no citation to authority to suggest otherwise. Accordingly, defendant failed to establish that Grant's performance was deficient.

¶ 67    Even assuming that defendant could establish that Grant's performance was deficient, defendant's ineffective assistance claim still fails, as he is unable to establish prejudice. Defendant argues that the postconviction court erred by finding that he failed to prove that he was prejudiced due to Grant's alleged deficient performance. Defendant asserts that, had he known of Dr. Kovar's and Dr. Conroe's opinions on an insanity defense, he would not have pleaded guilty but mentally ill and would have insisted on going to trial. However, the postconviction court found that it was defendant who sought to avoid a trial. The record supports this conclusion, and it is not manifestly erroneous.

¶ 68    Gossman testified that in June 2014 defendant indicated to her that he did not think he would be found not guilty and in September 2014 defendant indicated that he did not want to take the case to trial. Rather, defendant hoped to have the case resolved by the holidays because he did not want to put Michelle through a trial, especially while she was planning her wedding. He also did not want to review the autopsy and crime-scene photos and did not want his family to see them.

¶ 69    Grant testified that he explained to defendant that there was a possibility of him not being convicted if he was found not guilty by reason of insanity. In July 2014, Grant also told defendant that, if he was convicted of two homicides, he could be sentenced to natural life in prison. In September 2014, defendant told Grant that he did not want to go to trial and wanted the case resolved before the 2014 holidays and Michelle's wedding.

¶ 70    Further, defendant testified that he understood Dr. Kovar's and Dr. Conroe's purpose in meeting with him was to evaluate his sanity. But, before they completed their interviews, defendant told the doctors that he did not want to go to trial because he wanted to spare Michelle. Moreover, before defendant pleaded guilty, the plea hearing court thoroughly admonished him regarding his ability to raise an insanity defense. The court asked defendant whether he had reviewed Dr. Conroe's report, discussed it with counsel, and discussed with counsel his ability to raise an insanity defense. Defendant told the court that he had. The court then specifically asked whether defendant agreed that he was not asking to raise an insanity defense, and defendant replied that was correct. Further, despite the court's repeated admonitions during the plea hearing, defendant did not tell the court that he was pleading guilty but mentally ill only because he did not believe that he had a valid insanity defense. In addition, the court asked defendant if he had any questions before continuing with his plea, and defendant indicated that he had none. "Given the court's exhaustive admonishments and defendant's expressed understanding of the same," he cannot establish that, had he known of his ability to raise an insanity defense, he would have insisted on going to trial. *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 29 (the defendant could not establish that he was prejudiced by defense counsel's alleged improper advice where the trial court correctly admonished the defendant and he indicated that he understood). Based upon the postconviction court's general findings and its comments regarding witness credibility, we agree that it reasonably concluded that defendant had no questions either because Grant told him that

Dr. Conroe's report supported an insanity defense or because Dr. Conroe's opinion was of no consequence since defendant had decided to plead guilty, as he had repeatedly stated on prior occasions before the entry of the plea. Accordingly, defendant failed to establish that the findings were manifestly erroneous, or that he was prejudiced as required by *Strickland*.

¶ 71 As stated above, it was for the postconviction court to determine issues of credibility and resolve evidentiary conflicts. *People v. Reed*, 2020 IL 124940, ¶ 51; see *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68 ("Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court."). Absent manifest error, we will defer to the trial court's credibility determinations at the postconviction hearing. See *People v. Harris*, 2021 IL App (1st) 182172, ¶ 49 (when reviewing a third-stage evidentiary hearing, "[w]e generally defer to the circuit court as the finder of fact, since it is in the best position to observe the conduct and demeanor of the parties and witnesses"). The postconviction court specifically found that defendant's testimony was incredible, that he knew that he had support for an insanity defense, and that he decided to plead guilty but mentally ill. We determine that the judgment is not manifestly erroneous, based on the preceding collective analyses.

¶ 72                                    III. CONCLUSION

¶ 73 The judgment of the circuit court of Lake County is affirmed.

¶ 74 Affirmed.

*People v. Marcus*, **2023 IL App (2d) 220096**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 14-CF-1550; the Hon. Patricia S. Fix, Judge, presiding. |
| **Attorneys for Appellant:** | Nicholas Curran, of Kathleen T. Zellner & Associates, P.C., of Warrenville, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |